**PECK IRON AND METAL CO., INC.**

v.

**The UNITED STATES.**

No. 408–69.

United States Court of Claims.

May 15, 1974.

———◆———

Urban A. Lester, Washington, D.C., atty. of record, for plaintiff. Joseph J. Contrucci, Jr., and Lester & Contrucci, Washington, D.C., of counsel.

David R. Schlee, Washington, D.C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before DAVIS, NICHOLS and BENNETT, Judges.

## OPINION

PER CURIAM:*

The dispositive issue in this case is whether the Government breached its contract for the sale of a surplus aircraft carrier when it cancelled the agreement in its entirety under a provi-

---

* This opinion is based on the opinion of Trial Judge Spector, with some deletions and additions. We respect the trial judge's numbered findings of fact, but do not adopt them since our opinion incorporates all factual findings necessary to our decision.

sion which permitted it "to withdraw *for its use* any or all of the property covered by this contract, *if a bona fide requirement for the property develops* or exists *prior to actual removal of the property* from Government control." [Emphasis supplied.]

Other issues have also been litigated. Plaintiff urges a second independent breach occurred when the Government failed to accept its tender offer to pay the balance of the purchase price and to remove the vessel 6 weeks prior to cancellation. Had it been permitted to remove the vessel, the quoted provision would have been inoperative since it speaks of a bona fide requirement "prior to actual removal." Also, as will be illustrated by the events hereinafter related, an unusually large and diverse number of agencies, subagencies, and officials entered into the determination to cancel the contract and to withdraw the carrier from the sale. It is therefore urged that a third independent breach occurred in that the contracting officer's action was not a product of his independent judgment, but rather a ministerial act imposed by others. We do not reach these other issues.

I

The contract in question was awarded and administered by the Defense Supply Agency (DSA) an independent agency within the Department of Defense (DOD) charged with procurement and logistics functions common to all three military departments. Among its responsibilities is the disposal of surplus property. This function is performed, *inter alia*, by one of its field offices, the Defense Logistics Services Center (DLSC), at Battle Creek, Michigan. DLSC, in turn, acts through a particular Defense Surplus Sales Office (DSSO). This contract resulted from an invitation for bids (IFB) issued by the DSSO

at Brooklyn, New York, on June 16, 1965.

The contract was for the disposal of the former aircraft carrier, U.S.S. Franklin, a vessel in the Navy's reserve or "mothball" fleet. The U.S.S. Franklin (hereinafter the ex-Franklin) was one of a number of carriers of the "Essex" class listed in category "C" of the reserve fleet.[1] Other carriers so classified were the U.S.S. Bunker Hill, U.S.S. Philippine Sea, and the U.S.S. Antietam. The U.S.S. Tarawa had been listed in category "B" for fiscal year 1965 and it was dropped into category "C" in fiscal year 1966 and thereafter. The U.S.S. Leyte was classified in category "B" for fiscal years 1965–68 and in category "C" for fiscal year 1969 and thereafter.[2] The U.S.S. Leyte was in fact berthed next to the ex-Franklin at Bayonne, New Jersey. Prior to being turned over to DSA for disposal, the ex-Franklin had been delisted and stricken from the naval register. All of the named vessels[3] were equipped with four General Electric 1250 KW turbogenerators.

The sale of the ex-Franklin was "for scrapping purposes only." Certain items of equipment, including the four turbogenerators and certain armor and steel plating, were to remain Government property and were not included in the sale. When plaintiff corporation, located at Portsmouth, Virginia, received a copy of the invitation for bids (IFB), its president, Julian Peck, and his assistant, Raymond Gottlieb, inspected the vessel at Bayonne, New Jersey, and prepared a bid based on an estimate of all costs necessary for performance of the contract, including removal and return of the turbogenerators and of the armor and steel plating cut to Government specifications.

An inspection of the vessel performed for the Government at about this time

---

1. Category "C" was the lowest assigned classification and vessels in this category were retained for activation only in the event of a general mobilization.

2. Category "B" vessels in the "mothball" fleet were eligible for selective activation in case of an emergency short of general war.

3. With the possible exception of the U.S.S. Tarawa.

by Boyd J. Outman & Associates showed the carrier to be in "a good state of repair and condition, both exterior and interior." The Outman report noted, however, that "vandalism had been accomplished by the crews doing the [interior] stripping in that practically every gauge or anything that had a glass cover had been hit with a hammer or some object." The report indicated that this damage detracted from the utility of some of the items auxiliary to the turbogenerators, and somewhat from the value of the vessel itself as scrap.

Taking into consideration the fact that some material had to be specially prepared and returned to the Government, and scrap prices prevailing on July 14, 1965, Outman concluded that the vessel had only a "break even" scrap value. In other words, it was estimated that the cost of moving, berthing and scrapping it would approximate anticipated revenue from the scrap. It was thought only "barely possible" that the vessel might bring as high as $25,000. A sales price of $1 was thought more likely. Some 4 months earlier a Government property sales specialist, Joseph Sullivan, had inspected the ex-Franklin as a prelude to drafting the IFB, and he had observed conditions similar to those described in the Outman report.

Plaintiff's bid in the amount of $137,206 was the only one received in response to the IFB. Accordingly, a contract was awarded to plaintiff by a sales contracting officer at DSSO, Brooklyn, New York, Keith Williams. Shortly after award, Williams became ill and his duties with respect to this contract were taken over by Tobias Cohen, another sales contracting officer at DSSO, Brooklyn.[4]

In addition to the purchase price which it had offered to pay for the vessel, plaintiff estimated that it would cost $600,000 to $700,000 to reduce the ex-Franklin to scrap. A significant part of this cost was attributable to removal of the turbogenerators and preparation of the armor and steel plating in "cut-to-specifications" sections for return to the Government. The notice of award to plaintiff stated that the ex-Franklin would have to be removed from its berth at Bayonne by August 30, 1965.

On the day after award, August 4, 1965, Mr. Gottlieb of the plaintiff corporation, addressed a letter to Robert C. Moffitt, counsel at DLSC, Battle Creek, Michigan, asking whether statutory authorization existed for the contract provisions requiring preparation and return of the armor and steel plating in "cut-to-specifications" sections. He also wanted to know how the Government determined what it was paying for these items. In the letter plaintiff cited a Comptroller General decision[5] to the effect that a provision requiring the scrapping of anchors being sold as Government surplus, was without statutory basis and unenforceable. The provision contained in that contract (also with the plaintiff) had been inserted at the request of the Department of Commerce to assist economically depressed anchor manufacturers. On August 23, 1965, Mr. Moffitt responded to plaintiff's letter stating that the requirements for the removal and return of the armor and steel plating were established by the Navy, in cooperation with the General Services Administration (GSA) and the Atomic Energy Commission (AEC).

Mr. Gottlieb's letter of August 4, 1965, was followed by a number of phone conversations with Mr. Moffitt and, on August 8, 1965, he specifically inquired as to the extent of plaintiff's liability for the reserved items to be returned to the Government, and their val-

---

4. The IFB defined a Sales Contracting Officer as the "person accepting the bid in whole or in part on behalf of the Government, and any other officer or civilian employee who is a properly designated Sales Contracting Officer; and the term includes, except as otherwise provided in this contract, the authorized representative of a Sales Contracting Officer acting within the limits of the representative's authority."

5. B–150468, 43 Comp.Gen. 15 (1963).

ue, should the vessel be lost at sea while in tow to Portsmouth, Virginia. Mr. Moffitt instructed Mr. Gottlieb to consult the Comptroller General on that matter. Accordingly, on August 12, 1965, plaintiff wrote the Comptroller General protesting the armor and steel plating provisions, and citing the earlier decision involving the anchor contract. It was urged in that letter that provisions such as these serve to significantly reduce the return to the Government from the sale of surplus property, and that absent statutory authority, they were illegal. It was anticipated that a decision from the Comptroller General would be forthcoming in about 4 weeks or by the middle of September 1965. No decision was received within that period nor, in fact, at any time thereafter.

The relevance of this inquiry to the Comptroller General is that it served as the basis for an informal agreement between Messrs. Gottlieb and Moffitt to postpone the August 30 removal date until after the Comptroller General had ruled upon the protest. This postponement was with the understanding, expressed in Mr. Gottlieb's confirming letter of August 20, 1965, that it in no way affected the "relative positions" of the parties and that the "term for completion will begin to run upon settlement." There is a conflict of testimony as to whether or not their informal understanding contemplated indefinite suspension of any further action under the contract. Peck did not think it suspended performance indefinitely. On August 25, 1965, plaintiff wrote the Industrial Manager, U.S. Navy, 5th Naval District, Portsmouth, Virginia (INDMAN–5), as the result of instructions to do so from Contracting Officer Keith Williams. The purpose of the letter to INDMAN–5 was to request information on the area required for storage of the Government property scheduled to be removed from the ex-Franklin.

When plaintiff received a reply to its letter from a Mr. Eure to the effect that performance was being held in abeyance due to the protest lodged with the Comptroller General, it responded September 1, 1965, that it was not its understanding that contract performance had been indefinitely postponed; that it understood that plaintiff could be required or could elect to move the vessel prior to receipt of the decision. In the case of the earlier Comptroller General decision, plaintiff had been permitted to continue performance pending receipt of the decision. Ordinarily when INDMAN–5 received or sent correspondence relating to DSSO activities, copies of such correspondence were furnished to DSSO, and it is assumed that was done in this case. Walter Grancher, Chief of DSSO, recalled seeing Mr. Eure's letter, but could not recall plaintiff's reply of September 1.

It was the opinion of Mr. Moffitt at DLSC, Battle Creek, that a moral obligation existed to inform the Comptroller General before authorizing removal of the vessel. He had advised the contracting officer that an agreement had been reached to hold performance in abeyance pending word from the Comptroller General. Neither Mr. Cohen nor any other DSSO contracting officer had anything to do with this informal agreement or understanding between Messrs. Gottlieb and Moffitt. According to Mr. Cohen, Mr. Moffitt of DLSC served DSSO, Brooklyn, in an advisory capacity only and had no authority to modify or otherwise alter actions of DSSO contracting officers. In any case, subsequent events, hereinafter described, illustrate clearly that Government officials concurred with plaintiff's understanding that the pending reply from the Comptroller General was not an impediment to further performance under the contract. They later acted as though performance could proceed without awaiting a reply. It is concluded that the informal understanding of the parties did not contemplate an indefinite cessation of performance.

On August 19, 1965, Navy Comdr. E. Dente, Group Material Officer, Atlantic Reserve Fleet at Philadelphia, wrote plaintiff to the effect that five working

days' notice would be required as a condition to removal of the ex-Franklin. This was because the vessel was drydocked at Bayonne and tugboats would have to move it from its berth, after mooring lines, power cables and gangways had been removed. Thereafter, on September 13, 1965, Mr. Moffitt of DLSC discussed with plaintiff a possibility that DSA might have to move the ex-Franklin from Bayonne to Brooklyn should the Navy develop an emergency need for the Bayonne docking facilities. On the occasion of that discussion, plaintiff requested that if it became necessary to move the ex-Franklin, that it be moved to the Norfolk, Virginia, area, the additional expense to be charged to plaintiff.

It was on a Friday at 1:15 p.m., September 24, 1965, that plaintiff's president, Mr. Peck, phoned the contracting officer, Mr. Cohen, offering to remove the vessel a week later on Friday, October 1. Mr. Peck stated that he would like to come up to DSSO, Brooklyn, on the following Tuesday morning, September 28, with a certified check for the balance of the purchase price and a letter authorizing a towing company to pick up the vessel on October 1. It appeared that plaintiff had an opportunity to take advantage of a favorable towing rate on that day at a saving of approximately $10,000 below the normal towing cost of about $28,000.

Mr. Cohen advised Mr. Peck that he could not authorize release of the ex-Franklin without first obtaining legal advice, and instructed him not to come to Brooklyn until he had heard further. Prior to this phone conversation, neither of the contracting officers, Mr. Cohen or Mr. Williams, had dealt with plaintiff regarding postponement of the originally stipulated removal date nor on any other matters relating to the contract. All prior dealings with plaintiff had been conducted by Mr. Moffitt of DLSC.

Mr. Cohen attempted to contact Mr. Moffitt at 1:45 p.m. on September 24, but was advised that he was elsewhere on temporary duty and that another attorney at DLSC, a Mr. Darrow, was attending a conference in the office of George W. Shelhorse, Assistant Legal Counsel, DSA headquarters in Washington. Mr. Cohen immediately contacted Mr. Darrow and advised him of Mr. Peck's request to pay for and take possession of the vessel. But Mr. Darrow was unable to supply any legal advice at that time, and instructed the contracting officer not to authorize delivery until he was able to obtain legal advice. Mr. Darrow said that he would call back later that afternoon with the necessary instructions. It appears that on the afternoon of September 24, Messrs. Shelhorse and Darrow had been informed that the armor plate specifications might be changed. These specifications had been furnished to DSA by AEC, the scheduled recipient of the plates once they were removed.

When Mr. Cohen had not heard from Mr. Darrow by 4 p.m., September 24, he again called headquarters in Washington and was informed by Mr. Shelhorse that Mr. Darrow had returned to Battle Creek, Michigan, without leaving a message. When Mr. Cohen repeated his discussion of Peck's request to pay for and remove the vessel with Mr. Shelhorse, he was told to advise plaintiff that no answer would be forthcoming on September 24 because DLSC legal counsel had not been available on that date. Mr. Cohen then called Mr. Peck to so inform him, and to advise him that release of the vessel could not be authorized. He suggested that Mr. Peck call DSSO, Brooklyn, on Monday, September 27. Mr. Peck stated that his office would be closed on Monday since the 27th was a Jewish high holy day. Mr. Cohen responded that he would be out of his office on both the 27th and 28th for the same reason, but that Mr. Peck could get an answer to his question by calling DSSO.

On Monday, September 27, at 8:45 a.m., a conference was held at DSA headquarters in the Washington area to discuss the contract for the sale of the ex-Franklin. Joseph H. Rattelsdorfer,

Chief Merchandising Division, DLSC, requested that Mr. Grancher, Chief, DSSO, Brooklyn, and Mr. Sullivan, a property sales specialist at DSSO, be present. Others present included Vincent Tolino, a DSA staff representative on surplus property disposition, and the aforementioned Mr. Shelhorse. Neither Mr. Moffitt of DLSC, nor Mr. Cohen of DSSO were present, the latter being represented by Mr. Grancher. According to a contemporaneous memorandum prepared by Mr. Grancher, the purpose of the September 27th conference:

> '* * * was an attempt to obtain all possible information in order that a decision might be reached as to whether it should be recommended that the contract with Peck should be cancelled or whether the vessel should be delivered to Peck upon completion of full payment.

There is no indication in the record as to the grounds on which possible cancellation was being considered. Peck was certainly not aware that cancellation of its contract was under consideration.

Following the conference, Mr. Shelhorse and Brig. Gen. William T. Hamrick, Executive Director of Logistics and Services, DSA, met with Vice Adm. Joseph M. Lyle, the Director of DSA, to brief him. According to Mr. Shelhorse, Admiral Lyle "felt very strongly" that if Peck offered to pay for the vessel, the money should be accepted and the vessel released. The next morning, September 28, Mr. Shelhorse telephoned Mr. Moffitt to inform him of Admiral Lyle's decision. In addition, General Hamrick later sent an October 1 letter to DLSC at Battle Creek advising that office of Admiral Lyle's decision.

Mr. Moffitt then called Mr. Gottlieb at plaintiff's office and found that he was away and not scheduled to return until the following day, September 29. Mr. Gottlieb returned the call at approximately 9:15 a.m. the next morning and was asked by Mr. Moffitt the specific question of whether or not he would be able to move the ex-Franklin on October 1, 1965. He did not advise Peck of the decision by Admiral Lyle to release the vessel to Peck upon payment of the purchase price. Mr. Gottlieb checked to see if it was still possible to move the vessel on October 1 and later that day informed Mr. Moffitt that he would not be able to move the ex-Franklin on that day because favorable towing arrangements were no longer available. Mr. Moffitt was not aware of the Navy's requirement that at least five working days' notice had to be given before the ex-Franklin could be moved from its drydock in Bayonne, because Mr. Cohen, the contracting officer, had not informed Mr. Moffitt of this requirement.

Sometime between September 29 and October 1, 1965, Mr. Moffitt informed Mr. Cohen of Admiral Lyle's decision to release the vessel to Peck upon payment of the purchase price. Mr. Grancher, Chief, DSSO, was also a party to this conversation, but neither Mr. Cohen nor Mr. Grancher communicated that decision to Peck. It was not until sometime between September 29 and November 16, 1965, when the contract was cancelled, that plaintiff informally became aware of the fact that it would possibly be permitted to take possession of the ex-Franklin if it desired. This information came to the attention of plaintiff as the result of informal discussions with either DSA representatives other than Messrs. Cohen, Grancher and Moffitt, or with competitors of plaintiff who indicated that they had acquired the information in the course of their dealings with the Government.

In the fall of 1965, the National Aeronautics and Space Administration (NASA) informed the Navy's Instrumentation Ship Project Office (ISPO) that additional sources of power would be required for communications equipment on each of three converted tankers[6] being prepared under a contract between the Navy and General Dynamics Corporation for use in conjunction with the

---

6. Each tanker already had three General Electric 1250 KW turbogenerator sets on board.

Apollo program's tracking system. Turbogenerators of the type found on the ex-Franklin and other ships are a standard and conventional means of converting power from the ships' engines into electrical energy for auxiliary on board uses. By way of background, NASA had developed a need for instrumentation ships back in November 1963 in conjunction with its Apollo program. The ships serve as links in a communications system, where manned flights are destined to cross over large bodies of water and therefore land-based communications facilities are inappropriate. The Navy's ISPO was charged with providing this support to NASA.

The Navy's Bureau of Ships (BU-SHIPS) had entered into the aforementioned contract with General Dynamics on September 9, 1964, for the design, repair and conversion of three tankers to serve as instrumentation ships. The contract contemplated fabrication and installation of sophisticated electronics and instrumentation. Certain of the equipment to be installed was to be Government-furnished and was to be procured by the Navy from private suppliers or from existing Navy inventory. The converted tankers were scheduled to be delivered to the Government at the General Dynamics Electric Boat facility, Quincy, Massachusetts, on January 6, April 4 and July 1, 1966. The Apollo program was of high priority and NASA had indicated on May 22, 1965, that satellite communications capability should be available aboard the instrumentation ships in time to support the first lunar simulation mission scheduled for October 1967.

The original decision to place the ex-Franklin's four turbogenerators on a "save list" of material to be returned to the Government, had been unrelated to the NASA requirement which developed in the fall of 1965 for additional sources of power on the instrumentation ships. The turbogenerators had been earlier reserved from the sale of the ex-Franklin to plaintiff as the result of a February 11, 1965, request by BUSHIPS to DSSO, Brooklyn, asking that they be returned to the nearest Naval Supply Activity Center after removal. In a memorandum of April 2, 1965, the Commander, Atlantic Reserve Fleet at Philadelphia, had indicated to DSSO that four GE 1250 KW turbogenerators were aboard the ex-Franklin and "available for industrial removal by the purchaser as a condition of sale." On May 17, 1965, Mr. Grancher of DSSO had advised BU-SHIPS that the agreement for sale of the ex-Franklin would require removal and return of the four turbogenerators by the purchaser within 2 years, or 730 days, from the date of award, indicating no great urgency at that time.

The turbogenerators bore a classification number indicating that a set consisted of a turbine, generator, exciter, and reduction gear, all attached to a common base plate. In disposing of the ex-Franklin, it had not been intended to reserve any auxiliary equipment such as the condenser or voltage regulator.

When the NASA need arose, Navy BUSHIPS conducted a survey of private and Government sources to locate three turbogenerator sets capable of providing the additional power required on the instrumentation ships being converted. The survey turned up one turbogenerator in Navy stock. It disclosed the four turbogenerators scheduled to be removed from the ex-Franklin and returned to the nearest Naval Supply Activity Center within 2 years. There was also some effort to contact private sources of supply, but the parties dispute the adequacy of this survey. There were turbogenerator sets on other vessels in the "mothball" fleet from which the ex-Franklin had been delisted.

On October 22, 1965, Gary Jayne of Navy BUSHIPS, called Harry Leffler of DSSO to inform him that a request had been made for the four turbogenerator sets scheduled to be removed from the ex-Franklin. He wanted to know when they could be removed because the Apollo support ship program required them by August 1966. In a contemporaneous memorandum of this phone con-

versation, Mr. Leffler recites that the need for the equipment was so urgent that BUSHIPS would be *"willing to negotiate with Purchaser for early removal* [of the turbogenerator sets]—*money is no object."* (Emphasis supplied.) That same day, Mr. Hageman of BUSHIPS had also called Mr. Sullivan of DSSO to tell him that the BUSHIPS need for the equipment was "urgent." Mr. Sullivan informed Mr. Hageman of Mr. Jayne's duplicating call to Mr. Leffler and suggested that Mr. Hageman contact Mr. Jayne in his own office. It was also on October 22, 1965, that Mr. Burrows of BUSHIPS phoned Admiral Lyle, Director of DSA, and asked his assistance in securing the turbogenerators from the ex-Franklin.

This willingness of the Navy to negotiate with the purchaser of the ex-Franklin for removal of the turbogenerators by a date earlier than required under the purchase contract, was not conveyed to Peck. Instead, Mr. Rattelsdorfer of DLSC phoned Mr. Grancher of DSSO, Brooklyn, on October 22 to inform him that the Navy would remove the four turbogenerators from the ex-Franklin. He warned Mr. Grancher to make sure that Peck did not learn of the Navy's plans, and this information was immediately communicated to the two contracting officers, Messrs. Cohen and Williams.

An October 29, 1965 status report prepared by Mr. Tolino of GSA indicated that representatives of BUSHIPS, General Dynamics and General Electric [7] intended to inspect the ex-Franklin on the morning of November 3, 1965. If the turbogenerators were found on inspection to be suitable for installation on the instrumentation ships, it was contemplated that other auxiliary equipment, not on the "save list," might also be removed from the vessel. Mr. Tolino's status report also states that "the Navy has agreed to identify its needs in writing after the inspection and to verify

that the desired equipment is not available in the supply system." The report continues:

If units other than the four turbogenerators are required and removed or if items lose their value, it will be necessary to negotiate with Peck, or if negotiation fails, cancel the contract on the basis that the government had further requirements for utilization of property.

Following the November 3, 1965 inspection, it was concluded that the four turbogenerators aboard the ex-Franklin were acceptable and Mr. Jayne of BUSHIPS initiated proceedings to secure their removal, together with various other items not on the "save list." It was concluded that all four turbogenerators should be removed although only three were needed. Mr. Jayne knew that some equipment was missing, and that the Navy could "cannibalize" the extra unit to come up with three working units. He had no specific idea of what auxiliary equipment not on the "save list" in Peck's contract the Navy might want, but it was his plan to take as much equipment as possible from the vessel and determine at a later date whether it was usable.

A memorandum prepared by General Hamrick of DSA on November 10, 1965, recites under the dateline November 4, 1965, that the Navy "agreed to give Peck an opportunity to perform the work [required to remove the turbogenerators and other equipment from the ex-Franklin] within a Navy established time frame." The memorandum envisioned the necessity of negotiating with Peck regarding a price for earlier removal of the power units, plus the auxiliary items not on the "save list."

Peck, however, was never informed of the Navy's interest in negotiation, nor were negotiations ever conducted with Peck. Instead, Messrs. Shelhorse and Tolino of DSA, and Messrs. Jayne and Burrows of the Navy, met on November

---

7. General Electric would be responsible for reconditioning the turbogenerators, if they were found suitable and removed.

8, 1965, and concluded that the turbogenerators could be most efficiently removed by cancelling the contract with Peck and returning the entire vessel to the Navy. It was contemplated that after the Navy had removed the necessary equipment, the ex-Franklin would again be returned to the DSA for redisposal. This group thought that withdrawal of all of the property covered by the contract and cancellation of the contract in its entirety was authorized by the following provision, partially quoted at the beginning of this opinion:

### 38. WITHDRAWAL OF PROPERTY AFTER AWARD

Notwithstanding any other provisions of this contract to the contrary, and irrespective of the provisions of this contract relating to title to the property, the Government reserves the right to withdraw for its use *any or all of the property* covered by this contract, *if a bonafide requirement for the property develops* or exists *prior to actual removal of the property from Government control*. In the event of a withdrawal *under this provision*, the Government shall be liable only for the *refund of the contract price* of the withdrawn property or such portion of the contract price as it may have received. [Emphasis supplied.]

It was the responsibility of Mr. Shelhorse, Assistant Legal Counsel, DSA, to advise the Director on whether or not cancellation of a particular surplus sales contract was appropriate. He acknowledged in his testimony that there was no reason why the Navy could not have negotiated with Peck and assisted DSA in removing the equipment it wanted from the ex-Franklin. However, he had recommended cancellation of the entire contract because of the difficulties involved in meeting the Navy's December 15, 1965 deadline, and because it was his opinion from past experience that it would be difficult to negotiate with Peck. He was also concerned that other potential bidders for purchase of the ex-Franklin might protest if the contract were changed.

On November 12, 1965, Admiral Lyle, on behalf of DSA, authorized withdrawal of the ex-Franklin from sale, but conditioned his decision upon the Navy's officially requesting such withdrawal. His assistant, General Hamrick, had on November 10, 1965, written a memorandum indicating that the Navy was preparing a letter to that effect, namely, that withdrawal of the ex-Franklin was in the "best interest of the Government" and was "justified to satisfy utilization needs." On November 9, 1965, L. G. Bernard, writing for the Chief of Naval Operations, had requested the Director, GSA, to take the necessary steps to repossess the ex-Franklin.

It is noteworthy that the reverse of this procedure had apparently been followed earlier that year when BUSHIPS received a telegraphic message dated May 26, 1965, from the Naval Shipyard at New York, requesting removal of a number of NR 2 turbogenerator parts from the ex-Franklin. The material was "urgently required for installation on Intrepid." In that instance BUSHIPS approved the request, but subject to the "type commanders authorization *and concurrence of DSSO, Brooklyn.*" [Emphasis supplied.]

Events moved rapidly thereafter. On November 16, 1965, at 11:50 a. m., Mr. Rodocker, a lawyer at DLSC, Battle Creek, called Mr. Grancher of DSSO to inform him that the Navy had asked GSA to repossess the ex-Franklin. He advised Mr. Grancher that DSA legal counsel had been consulted and that Mr. Shelhorse of DSA and Mr. Sullivan of DSSO, were at that moment briefing Admiral Lyle. On that same day Mr. Moffitt of DLSC either drafted a letter to plaintiff withdrawing the ex-Franklin from sale under the above-quoted article 38, or approved a draft of such a letter being prepared by the DLSC Marketing Director, Mr. Krieger. Regardless of who prepared the letter, its text was communicated telephonically to DSSO and, in accordance with instructions he

received from DLSC, Contracting Officer Cohen immediately dispatched such a letter to plaintiff over his own signature.

At no time during the events above-described was any representative of Peck contacted. No inquiry was made to see whether or not Peck would be willing to remove the equipment it was already obliged to remove and return, earlier than required under its contract. Nor was any inquiry made to see if Peck would permit its earlier removal by others, which would have correspondingly released Peck from that obligation under its contract. No technical nor mechanical reason has been offered as to why the entire contract had to be cancelled and the vessel withdrawn from sale in order to procure earlier removal of the turbogenerator sets and removal of the auxiliary items not on the "save list." They were, in fact, removed without difficulty shortly thereafter.

During the period from October 22, 1965, when the specific need for the turbogenerators aboard the ex-Franklin arose, to November 16, 1965, when Peck's contract was formally cancelled, DSA, DLSC and DSSO employees relied essentially on representations of personnel at various Navy offices in reaching their decision to cancel the contract. The Director of DSA in fact conditioned his approval of the cancellation, upon receipt of a request from Navy for such action.

The four turbogenerator sets represented a comparatively small part of the property sold pursuant to this contract. Their total weight, including condensers, was 100 tons, compared with a total weight of 25,500 tons for the ex-Franklin. The equipment represented 0.4 of 1 percent of the weight of the vessel.

Immediately following cancellation, Peck protested the Government's action. A letter and a phone call on November 18, 1965, were directed to the contracting officers, Messrs. Williams and Cohen. On December 1, 1965, Mr. Cohen responded to the effect that the decision to cancel the contract would not be rescinded.

On November 10, 1965, 6 days *prior* to the cancellation, the Government had issued an IFB for a contract to remove the equipment from the ex-Franklin. The Industrial Manager, 3rd Naval District, Brooklyn (INDMAN-3) sent the IFB only to those 15 companies which held Master Contracts for Repair and Alteration of Vessels with INDMAN-3. Since Peck did not hold such a master contract, it did not receive the IFB. The work was to be performed at the Naval Supply Activity Center, Bayonne, New Jersey, during the period November 22 to December 15, 1965.

Only two firms responded to this IFB and a contract was awarded to Hudson Engineering Company on its low bid of $114,000. In addition to the turbogenerator sets which were to be removed and returned by Peck, Hudson was to remove a number of other items including an auxiliary condenser, two pumps, an air ejector, a lube oil cooler, piping systems, associated valves, and various pieces of electrical equipment including voltage regulator sections. Hudson completed its work on December 17, 1965.

Thereafter, the turbogenerator sets were sent to General Electric for reconditioning, and thence to General Dynamics at Quincy, Massachusetts, for installation on the converted tankers. It appears from the testimony that it was to cost $50,000 to $80,000 per unit to recondition the turbogenerators, plus the cost of removal from the ex-Franklin, and shipping costs.

As for the non-"save list" auxiliary equipment removed from the ex-Franklin by Hudson, a General Dynamics receiving report dated December 16, 1965, indicated that a sizable portion of it arrived in "scrap" condition. This is equipment which had been earlier described in the Outman and Sullivan inspection reports as damaged by vandalism. A note on the receiving report states that:

All items designated as scrap are to be held in yard until end of contract —Gov't disposition to be obtained at that time.

This characterization of the material as "scrap" was not made until after it had been removed from the ex-Franklin and shipped to General Dynamics.

Other material removed from the ex-Franklin was not employed on the converted tankers for the additional reason that it was found to duplicate equipment designated as contractor-furnished under the General Dynamics contract. Duplicated items included the voltage regulator sections, the local control sections, the bus fee and remote control sections of all four generators, the auxiliary circulating water pump and controller, the condensate pump motors and controller, and the air ejector exhaust fan motors and controllers.

Sometime later an IFB was issued for resale of the ex-Franklin, once again for scrapping purposes. Bids were opened on June 29, 1966, and two bids were received this time. One was from Portsmouth Salvage Company in the amount of $228,000, and the other from Lipsett, Inc., in the amount of $18,660. Peck did not rebid. The contract for the resale of the ex-Franklin was awarded to Portsmouth.

Although trial for breach of contract was limited to the issue of liability, plaintiff was asked to submit some proof on damages to the extent that it might bear on the issue of liability. Exhibits were introduced indicating that Peck had actual expenses of $79,702.62 in connection with its aborted contract, and that it estimated a loss of anticipated profits on the salvage of the ex-Franklin in the amount of $427,188. The latter figure is based on reports of a competitor in scrapping the former aircraft carrier, U.S.S. *Enterprise*, on Peck's own cost records and experience in scrapping, and on contemporaneous scrap market prices.

## II

We conclude on these facts that the cancellation of plaintiff's contract for the purchase of the ex-Franklin constituted a breach of contract. In these circumstances it is unreasonable to interpret article 38, "Withdrawal of Property After Award," *supra,* as permitting withdrawal of the entire aircraft carrier, because a need arose for part of her equipment (a part which had not been included in the sales contract in any event). Article 38 authorizes withdrawal of the property by the Government *"for its use * * ** if a bonafide requirement for the property develops or exists prior to actual removal of the property from Government control" (emphasis supplied). It is clear, however, that the ex-Franklin was withdrawn, not because the Government needed or wanted the ship as a whole, but only because it desired a relatively small part of the equipment. During its consideration of whether to exercise rights under article 38 and at the time it sought to exercise those rights, the defendant always expected to re-offer the vessel for sale, after excising the portions it needed. In this situation—where the Government wants only a severable part or parts of an item and intends before cancellation to resell the remainder of the item after removing the parts it desires—it cannot be said that withdrawal of the entire item is "for its [the Government's] use" or that "a bonafide requirement for the [whole] property" has developed unless there is a clear showing that it was necessary to remove the whole item from sale in order to obtain the desired separable portions. That reading harmonizes with the overall aim of article 38 to confine the Government's power-to-withdraw to those instances in which it actually needs the property for its own purposes, and not where it intends to resell.

Here that kind of clear showing of need for the whole vessel has not at all been made. Other paths were not pursued or tried out. The main alternative available was that plaintiff could have been asked to forego its right to wait two years before delivering the generators, and could have been requested to hand over the generators (and the other needed parts) immediately. There is lit-

tle reason to think that plaintiff would have refused.[8] If the company had agreed, as seems probable, the materials could have been removed by the purchaser, or by Hudson as was actually accomplished, without cancellation of the contract. This was entirely consistent with the purchaser's ultimate responsibility to remove and return them under the terms of its contract, and was clearly in the purchaser's best interest. In fact, the substantial cost charged by Hudson for their removal might have been offset to some extent by the cost savings to plaintiff in being relieved of this contract obligation.

The ground given for not following such a plainly proper course was that it was believed that plaintiff would prove difficult and unreasonable. There is very little in the record to support that surmise.[9] But in any event, and at the very least, the Government could have made a flat demand on plaintiff for the generators (and other parts) and informed plaintiff that if defendant did not get them (on reasonable terms) as soon as possible article 38 would be brought into play. That was not done, and we cannot excuse the crucial omission. Plaintiff had a contract right to the ex-Franklin, and before that right was wholly destroyed under article 38 defendant should have made some effort to see whether the severable equipment it wanted could be obtained through plaintiff's cooperation—and without summarily and unnecessarily depriving the purchaser of its entire bargain. It is very difficult to comprehend why no effort was made to work out this prob-

lem with Peck less traumatically than by total cancellation, particularly after the Navy had expressed a willingness "to negotiate with Purchaser * * * money is no object." [10]

It is argued that the need for cancellation of the whole contract is supported by the requirement which developed for auxiliary equipment not on the "save list." As we have just indicated, this argument does not bear scrutiny. These relatively minor items appurtenant to the turbogenerators could also have been removed without withdrawing the entire vessel, as they were in fact removed by Hudson. Although Peck did not have the same contract obligation to remove and return the auxiliary items as it had in the case of the turbogenerator sets themselves, the addition of this obligation (or the securing of permission from Peck for Hudson to remove them) appears to have presented no insurmountable difficulties. Peck was apparently willing to negotiate. The Navy was anxious to negotiate. Yet Peck was carefully shielded from the fact that ideal conditions for negotiation prevailed. Instead preparations were made to have the equipment removed by others, and these preparations began 6 days before plaintiff was advised that its contract had been cancelled. At the very least (as we have said), plaintiff's willingness could have been tested by a demand upon it to allow the removal of this additional equipment as well as of the generators.

Defendant also emphasizes the importance of the space program and its high priority. But this can be readily ac-

---

8. The trial judge found as a fact, and we agree, that there was no showing that Peck could not have effected the earlier removal of the turbogenerator sets and of the auxiliary items, or permitted their removal by others.

9. See note 8, supra.

10. See Ozark Dam Constructors v. United States, 127 F.Supp. 187, 191, 130 Ct.Cl. 354, 360 (1955):

"* * * The possible consequences [of a strike] were so serious, and the action

necessary to prevent those consequences was so slight, that the neglect was almost willful. It showed a complete lack of consideration for the interests of the plaintiffs. If the plaintiffs really included in their bid an amount to cover the contingency of such inconsiderate conduct on the part of the Government's representatives, the Government was buying and the public was paying for things that were worth less than nothing." Constrast, Coast Iron & Metal Co., ASBCA No. 14082, 70–2 BCA ¶ 8392.

knowledged, without it following therefrom that the ex-Franklin therefore had to be withdrawn from sale. The status of the space program did not prevent an attempt to negotiate with plaintiff—nor did it make impossible a demand on plaintiff to permit removal from this surplus carrier of the required items. There is nothing to suggest that removal of this standard, conventional equipment could not have been done while plaintiff continued to have an interest in the vessel.[11]

We hold, for these reasons, that article 38 did not authorize what the defendant did here, and accordingly that the contract was broken.

### III

Defendant urges that plaintiff is nevertheless not entitled to any damages because article 38 limits the Government's liability to "refund of the contract price * * * or such portion of the contract price as it may have received." The simple answer to that ar-

gument is that the quoted limitation on liability pertains "[i]n the event of a withdrawal *under this provision.*" [Emphasis supplied.] It is the essence of this decision that withdrawal of the aircraft carrier was not in accordance with the provisions of article 38, but in violation and in breach thereof. Certainly the article does not say, and should not be read as saying, that any contract in which it is contained is incapable of being breached.[12]

Defendant also suggests that another limitation on liability article[13] is for application. It is the article which governs when the Government has breached the warranty contained in its "Guaranteed Descriptions" clause[14] and has further elected to have the property returned to it under that clause, *after removal* by the purchaser. It limits liability to the costs of removal by the purchaser, plus return of the purchase price. By its terms, it has no application to the facts in this case which rests on breach of a provision (article 38)

---

11. It is possible, also, that the equipment could have been purchased from private suppliers or taken from other vessels in the "mothball" fleet earmarked for disposal, but we find it unnecessary to determine whether the proof is adequate to show that such alternatives were readily available.

12. *Ozark,* note 10 *supra. See also,* Benjamin v. United States, 348 F.2d 502, 516–517, 172 Ct.Cl. 118, 137–138 (1965); Freedman v. United States, 320 F.2d 359, 366–367, 162 Ct.Cl. 390, 402–403 (1963); and Fox Valley Eng'r Inc. v. United States, 151 Ct.Cl. 228, 238–239 (1960).

13. "11: LIMITATION ON GOVERNMENT'S LIABILITY. Except for direct *costs incurred by the Purchaser in removal of the property,* when a *return of property at Government cost is authorized by the Government for its benefit,* the measure of the Government's liability in any case where liability of the Government to the Purchaser has been established shall not exceed refund of such portion of the purchase price as the Government may have received." [Emphasis supplied.]

14. "(1) Except as provided in sub-paragraphs (2) and (3) of this clause, and with the exception of stated opinions as to the condition of the property, and notwithstanding any other terms and conditions of this

Invitation for Bids to the contrary, the Government hereby *warrants and guarantees* that the property to be delivered to the Purchaser under any contract resulting from this Invitation for Bids *will be as described* in the Invitation for Bids. In the event that the property delivered or offered for delivery *does not correspond to the description* set out in the Invitation for Bids, the Government, *at its option,* shall either: (a) *direct the return of the property at Government expense to the closest military installation, reimbursing the Purchaser for all reasonable transportation charges incurred in shipping the property to the original destination specified in the Purchaser's shipping instructions* (excluding any transportation costs incurred in shipping the property outside the Continental United States) and refunding to the Purchaser, the purchase price or such portion of the purchase price as the Government may have received, or (b) *make an equitable adjustment in the contract price.* In the event the Government elects to adjust the contract price and an agreement cannot be reached with the Purchaser as to the amount of the adjustment, the Contracting Officer shall unilaterally determine the amount of the adjustment, which determination shall be in the form of a finding of fact and shall be appealable under the disputes article of the contract." [Emphasis supplied.]

permitting cancellation *prior to removal,* if the conditions set forth therein have been met.

Plaintiff is entitled to recover. The amount of recovery is reserved for further proceedings under Rule 131(c).

### CONCLUSION OF LAW

Upon the foregoing opinion, containing the necessary findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery is reserved for further proceedings under Rule 131(c).