John CONVERY

v.

The UNITED STATES.

No. 392–77.

United States Court of Claims.

April 18, 1979.

David Rein, atty. of record, Washington,
D.C., for plaintiff

Robert M. Hollis, Washington, D.C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and DAVIS, Judge.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

COWEN, Senior Judge.

Plaintiff brought this suit to recover damages for breach of contract arising from the Government's refusal to deliver surplus property it had contracted to sell to the plaintiff. The property was a computer output device which was withdrawn by the owning agency from surplus sale after plaintiff's bid had been accepted and the purchase price paid, but before plaintiff had moved the equipment from Government control.

The parties' cross-motions for summary judgment present the following questions for decision:

1. Whether by reason of the nonappropriated funds doctrine, the court lacks jurisdiction of plaintiff's suit for breach of contract;

2. Whether the withdrawal of property clause of the contract authorized the Government to withdraw the property from sale and rendered the Government liable only for the refund of the contract price paid by plaintiff; and

3. Whether a contractual provision, "Limitation on Government's Liability," applies in this case and limits the Government's liability to a refund of the purchase price.

We reject the Government's contention that we lack jurisdiction, but conclude that the withdrawal of property clause applies, and accordingly hold that defendant's cross-motion for summary judgment should be granted.

The material facts are not in dispute. In September 1976, the General Services Administration (GSA) solicited bids for the sale of various surplus property items, including a Stromberg Carlson 4440 Off Line Micromation Printer, a device which prints data from a digital computer onto microfilm. The machine had been declared as excess personal property by the owning agency, National Computer Center (NCC) of the Internal Revenue Service (IRS). It had been taken out of service and placed in storage, because it needed extensive repairs and could not be used in that condition for the peak tax filing periods in January, February, and March 1977. Replacement parts and an overhaul would have cost the Government $100,000. Likewise, the machine could not be used for retention of registers for old tax returns unless overhauled. Plaintiff submitted a bid with a deposit in the amount of $276.96, and on October 7, 1976, he received from GSA a Notice of Award stating that his bid had been accepted and acknowledging that full payment had been received. He was authorized to remove the property by October 26, 1976.

On September 29, 1976, Datagraphix, the manufacturer of the machine, submitted to NCC an offer to allow a substantial trade-in credit for the machine toward the purchase of a new machine, model 4560, with two tape units, along with the addition of a second tape unit on each of the 4560's which had already been installed at the National Computer Center.

By letter of November 15, 1976, NCC submitted an amended request for the withdrawal of the machine from excess, with the following justification:

The National Computer Center is purchasing a new Computer Output Microfilm (COM) Printer. Datagraphix Corporation will allow us $9,288.00 trade-in for the above described unit. Therefore, it would be beneficial to the government to remove this unit from excess and use it as trade-in. The excess price would only realize $276.96. By withdrawing the item the government would save $9,011.04 on the acquisition of the new COM.

Final approval for the withdrawal was given by GSA on December 30, 1976. On December 21, 1976, the property was transferred to the original manufacturer for a trade-in credit of $22,500 [1] toward the purchase of the new equipment. The machine was removed from the possession of the Government on July 17, 1977.

On January 13, 1977, GSA wrote plaintiff that the property had been withdrawn by the owning agency for use in its operations and that his payment would be refunded. The refund was made.

### I. *The Nonappropriated Funds Issue*

In numerous decisions over the years, this court has held that we have jurisdiction to award damages against the Government in actions for breach of contract resulting from the Government's failure to deliver surplus goods it had contracted to sell. Acknowledging that it has not heretofore raised this jurisdictional issue in such cases, the Government asserts that this court is not authorized to award damages to plaintiff in excess of the purchase price, because to do so would require payments notwithstanding the absence of appropriated funds.

Although it arises here in a different context, we have dealt with the question in many prior decisions. In *Butz Engineering Corp. v. United States*, 499 F.2d 619, 204 Ct.Cl. 561 (1974), we stated:

> * * * when a federal instrumentality acts within its statutory authority to carry out defendant's purposes, the United States submits itself to liability under the Tucker Act *unless* "some specific provision to the contrary" exists. * * * [499 F.2d at 622, 204 Ct.Cl. at 567–68; emphasis in original.]

In *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 907, 209 Ct.Cl. 446, 476 (1976), we declared that the nonappropriated funds doctrine applies if the activity was "specifically intended to operate without using appropriated funds."

There is no doubt that both GSA and IRS were functioning here as instrumentalities of the Federal Government; that they were acting within their statutory authority, and that their activities were financed primarily by Congressional appropriation.

However, the defendant contends that in enacting 40 U.S.C. § 485(d), which is included in the Federal Property and Administrative Services Act of 1949, Congress intended that no appropriated funds may be used to pay breach of contract damages as claimed by plaintiff in this case. The Government also says that its position is supported by our decisions in *Kyer v. United States*, 369 F.2d 714, 177 Ct.Cl. 747 (1966), *cert. denied* 387 U.S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 990 (1967); *McCloskey & Co. v. United States*, 530 F.2d 374, 208 Ct.Cl. 697 (1976); *Novid Co. v. United States*, 535 F.2d 5, 210 Ct.Cl. 1 (1976), and *Manning v. United States*, 200 Ct.Cl. 756 (1973).

The cases relied on by the defendant fall far short of the mark. In *Kyer*, the contract in question was not entered into with a department or agency of the Government, but with an administrative committee established by the Secretary of Agriculture. The committee was not supported by Congressional appropriations and was not authorized to obligate appropriated funds. Its financial support came from handlers and producers of agricultural commodities.

*McCloskey*, like *Kyer*, involved a contract between the plaintiff and an agency of the District of Columbia—not a bureau or department of the United States Government. Furthermore, the Act which authorized the contract provided that all costs of planning, designing, and construction were to be financed by the issuance of bonds and stated that the financial liability for the undertaking was specifically limited to the funds generated by the bonds.

In *Novid*, 210 Ct.Cl. at 6, 535 F.2d at 8, the court expressly found that the agreement in issue "strictly limited contract payments to the Iranian Government loan

---

1. There is a conflict in the record as to the amount of trade-in credit allowed by the manufacturer. For the purposes of this case we have adopted the figure of $22,500 stated in defendant's answers to plaintiff's interrogatories.

account established in the Foreign Trade Bank of Iran." From this, the court concluded that appropriated funds were wholly insulated from liability.

In *Manning*, the plaintiff sued upon a claimed contract of employment with a nonappropriated fund activity in the same category as the administrative committee in *Kyer*.

■ As previously stated, the statutory provision upon which defendant relies is subsection (d) of 40 U.S.C. § 485. Subsection (a) thereof provides that all proceeds from "any sale, lease, or other disposition of surplus property, shall be covered into the Treasury as miscellaneous receipts," except as otherwise provided in the same section. This language is typical of the appropriated fund activities of Government agencies and departments. Moreover, section 485(d) is by no means as restrictive as defendant argues. It provides:

(d) *Special account deposits*

Any Federal agency disposing of surplus property under this subchapter (1) *may* deposit, in a special account with the Treasurer of the United States, such amount of the proceeds of such dispositions as it deems necessary to permit appropriate refunds to purchasers when any disposition is rescinded or does not become final, or payments for breach of any warranty, and (2) *may* withdraw therefrom amounts so to be refunded or paid, without regard to the origin of the funds withdrawn. [Emphasis added.]

The use of the permissive "may" is a strong indication that Congress did not intend that the contract sued upon here is one which could not be satisfied out of appropriated funds. In *Breitbeck v. United States*, 500 F.2d 556, 559, 205 Ct.Cl. 208, 212 (1974), which involved a somewhat comparable situation, we said that although Congress attempted to make the agency self-supporting, there were "likewise substantial indications that this was not to separate it wholly from the Treasury." In *Hughes Aircraft, supra*, we reached a similar result.

In *DeMauro Constr. Corp. v. United States*, 215 Ct.Cl. 364, 568 F.2d 1322 (1978),

we held that the doctrine urged upon us by defendant does not apply where the agency's activities are financed both by appropriated funds and nonappropriated funds.

Finally, we think this is an appropriate case for directing attention to the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 125–36, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), wherein the Supreme Court made it abundantly clear that stronger and more explicit statutory language than that relied on by defendant is required to deprive a claimant of his Tucker Act remedy.

## II. *Applicability of the Withdrawal of Property Clause*

Having decided that we have jurisdiction of plaintiff's claim, we now consider whether the following provision, included as Clause 23 of the contract, is applicable:

23. WITHDRAWAL OF PROPERTY AFTER AWARD.

The Government reserves the right to withdraw for its use any or all of the property covered by this contract, if a bona fide requirement for the property develops or exists prior to actual removal of the property from Government control. In the event of a withdrawal under this condition, the Government shall be liable only for the refund of the contract price of the withdrawn property or such portion of the contract price as it may have received.

Plaintiff would have us construe the clause narrowly, limiting its application to situations where the property is needed for the *physical* use of the owning agency. Plaintiff agrees that defendant needed the new SD 4560 machine but argues that the requirement for it could have been satisfied by payment in cash therefor without the trade-in of the unit in issue. Reasoning that the trade-in was not essential for obtaining the new equipment, plaintiff says the transaction was functionally and financially the same as a resale of the machine for more than plaintiff's bid price. His position, plaintiff maintains, is supported by our decision in *Peck Iron & Metal Co. v.*

*United States*, 496 F.2d 543, 204 Ct.Cl. 381 (1974). We do not agree.

We think *Peck Iron & Metal Co.* is distinguishable on its facts. In that case, the contract for the sale of a surplus aircraft carrier contained a reservation of four turbogenerators for the use of the Government. Plaintiff was required to remove and return them to the Government within 2 years. Later, Government officials concluded that the generators could be more efficiently removed by cancelling plaintiff's contract and returning the entire vessel to the Navy. No inquiry was made of plaintiff to learn whether it would be willing to remove this equipment earlier than required by the contract, or whether plaintiff would permit such removal by others. When withdrawal of the carrier was considered, the Government expected to re-offer the vessel for sale after removing the generators. Under all of these circumstances, we held that the withdrawal clause of the contract did not apply and that the Government breached its contract of sale. We held that unless the Government could show that it was necessary to remove the whole item from sale in order to obtain the desired equipment, there was not a bona fide requirement for the withdrawal of the carrier. In the context of the facts then before us, we stated that the withdrawal article does not apply where the Government withdraws the property with the intention of reselling it. However, the trade-in under the circumstances present in this case was not, for the reasons discussed below, equivalent to a withdrawal for resale.

 We think Clause 23 should not be interpreted as a restriction to a particular mode of use. Rather, it is expressive of a broader right reserved to the Government, so that application of the clause is not limited to situations where the withdrawing agency can show a necessity for its *physical* use of the property. Statutory authority for the sale, exchange, transfer, or other disposition of surplus Government property is set forth in the Federal Property and Administrative Services Act of 1949, now codified in 40 U.S.C. §§ 471–544. In addition to providing for the use of such property by Government agencies, the Act authorizes the transfer of surplus property to state agencies for public health, recreational, and educational purposes. Generally, a transfer, use, or exchange of surplus property for the purposes authorized by the Act would constitute "a bona fide requirement for the property" within the intent of Clause 23. However, we need not base our decision on such general grounds, for we find that specific authority for the trade-in of the 4440 computer device was granted by 40 U.S.C. §§ 481(a) and (c) (Supp. V, 1975), and therefore, that there was a bona fide requirement for the property, justifying GSA's approval of the withdrawal. The applicable statutory provision in effect at the time of the withdrawal read as follows:

§ 481. *Procurement, warehousing, and related activities*

(a) *Policies and methods of procurement and supply; operation of warehouses*

The Administrator shall, in respect of executive agencies, and to the extent that he determines that so doing is advantageous to the Government in terms of economy, efficiency, or service, and with due regard to the program activities of the agencies concerned—

(1) subject to regulations prescribed by the Administrator for Federal Procurement Policy pursuant to the Office of Federal Procurement Policy Act [41 U.S.C. 401 et seq.], prescribe policies and methods of procurement and supply of personal property * * *

 \* \* \* \* \* \*

(c) *Exchange or sale of similar items*

In acquiring personal property, any executive agency, under regulations to be prescribed by the Administrator, subject to regulations prescribed by the Administrator for Federal Procurement Policy pursuant to the Office of Federal Procurement Policy Act [41 U.S.C. 401 et seq.], may exchange or sell similar items and may apply the exchange allowance or proceeds of sale in such cases in whole or in part payment for the property acquired: *Provided,* That any transaction

carried out under the authority of this subsection shall be evidenced in writing.

Moreover, as defendant has pointed out, the regulations specify that the Government's need for the property takes precedence over its sale as surplus property:

Any need for personal property expressed by any Federal agency * * * shall be paramount to any disposal, if such need is made known to the holding or selling agency prior to actual removal of the property from Government control in the case of sale. [41 C.F.R. § 101–45.102.]

This result is in accord with the Congressional declaration of policy in enacting the 1949 Act:

§ 471. *Congressional declaration of policy*

It is the intent of the Congress in enacting this legislation to provide for the Government an economical and efficient system for (a) the procurement and supply of personal property * * *; (b) the utilization of available property; (c) the disposal of surplus property; and (d) records management.

By withdrawing the machine from surplus and trading it in on a new machine, which was badly needed, the Government realized a substantial saving which otherwise would have been lost.

III. *Application of the "Limitation on Government's Liability" Clause of the Contract*

The Government contends that even if the withdrawal of the SD 4440 from surplus was not authorized by Clause 23, its liability is limited by Clause 15 of the contract to a refund of the purchase price. Clause 15 provided:

15. LIMITATION ON GOVERNMENT'S LIABILITY.

Except for reasonable packing, loading, and transportation costs, when a return of property at Government cost is authorized, the measure of the Government's liability in any case where liability of the Government to the Purchaser has been established shall not exceed refund of such portion of the purchase price as the Government may have received.

Since our holding in Part II is dispositive, we need not and do not decide whether Clause 15 is applicable in this case.

IV. *Conclusion*

For the reasons stated in the foregoing opinion, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and plaintiff's petition is dismissed.

FRIEDMAN, Chief Judge, dissenting in part.

Although I agree with the court that the non-appropriated-funds doctrine is inapplicable in this case, I disagree with the ruling that the withdrawal-of-property clause of the contract bars the plaintiff's recovery.

If the court were prepared to hold that this clause applies whenever, after disposing of surplus property, the government concludes that the property should not have been declared surplus, I would have no difficulty in holding for the defendant. The court apparently is unwilling to go that far, however, presumably because of the statement in *Peck Iron and Metal Co. v. United States* that the purpose of this clause is to "confine the Government's power-to-withdraw to those instances in which it actually needs the property for its own purposes, and *not where it intends to resell.*" 204 Ct.Cl. 381, 400, 496 F.2d 543, 553 (1974) (emphasis added). The rationale for the court's holding in this case that the government had " 'a bonafide requirement for the property' " was that "[b]y withdrawing the machine from surplus and trading it in on a new machine, which was badly needed, the Government realized a substantial saving which otherwise would have been lost."

I do not think that the provision in this clause that the government may withdraw property that it has sold " 'for its use * * if a bona fide requirement for the property develops' " applies when the only reason for the withdrawal is to save the government some money. I see no difference analytically between the situation in this case—where the government withdrew because after

sale it discovered that it could obtain a substantially greater amount on a trade-in than it would realize on the sale—and a case where the government withdraws because it has been offered a higher price by a third party. The *Peck Iron and Metal Company* decision indicates that in the latter situation the clause does not apply, and I think the clause is equally inapplicable in the former. In neither situation does the government "need" the property "for its own purposes" except in the sense that it is financially advantageous for it to renege on its contractual commitment.

The case would be different if the government were required to surrender the sold article in order to obtain a replacement.[1] There is no claim, however, that that situation existed here. Indeed, it is far from clear that the withdrawal here was not the functional equivalent of a sale of the property. The amount of the trade-in the government was offered depended upon the cost of a replacement it would purchase. Datagraphix offered the government a trade-in allowance of $34,564 on two model 4440's if the government purchased replacements costing $173,934, but a trade-in allowance of only $20,000 on those two machines if it purchased equipment costing $119,788. The trade-in allowance thus appears, to a large extent, to be merely a method of providing a discount to the government. It is possible that a substantial, perhaps even comparable, discount could have been obtained even without a trade-in. I do not think that the government's wish to use this property to obtain a trade-in was sufficient to establish "a bona-fide requirement for the property" authorizing the government to withdraw the property "for its use."

---

1. I therefore agree with the court in rejecting the plaintiff's contention that the clause applies only when the government requires the physical use of the property.