**PECK IRON AND METAL CO., INC.**

v.

**The UNITED STATES.**

No. 408–69.

United States Court of Claims.

July 18, 1979.

Urban A. Lester, Washington, D. C., for plaintiff.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before KASHIWA, BENNETT and SMITH, Judges.

## OPINION

BENNETT, Judge:

The question in this case is what damage did plaintiff, a shipbreaker, suffer when the Government breached its contract to sell plaintiff a 30,000-ton surplus World War II aircraft carrier for scrapping. In an earlier decision, *Peck Iron & Metal Co. v. United States*, 496 F.2d 543, 204 Ct.Cl. 381 (1974), we concluded the Government had breached its contract and that plaintiff was entitled to recover. The determination of damages was reserved for further proceedings under Rule 131(c). Trial Judge Spector awarded plaintiff $565,794. Because key elements of the trial judge's opinion are unsupported by either the findings of fact or other record evidence, that award cannot be sustained. We conclude plaintiff is entitled to recover $1,963,817 and award judgment in that amount.

On August 3, 1965, plaintiff, Peck Iron and Metal Co., Inc. (Peck), located at Portsmouth, Virginia, was awarded a contract to scrap the ex-*Franklin,* an aircraft carrier which served in the Pacific Theatre during World War II. Under the terms of the contract, plaintiff was to pay $137,206 for the carrier and, in the process of scrapping, hold certain "save list" items for the Government, including four turbogenerators and about 5,000 long tons of armor and steel plating. After contract award, however, the Government decided the turbogenerators were needed sooner than they would be made available to it in the normal course of contract performance. Thus, on November 16, 1965, defendant cancelled plaintiff's contract in its entirety and withdrew the whole carrier from sale, acts which this court found to be in breach of contract. The ex-*Franklin* was again offered for scrapping in June 1966 after the turbogenerators and other auxiliary equipment had been removed. This time the high bidder for the vessel was Portsmouth Salvage Company (Portsmouth) with its winning bid of $228,000. Portsmouth successfully completed scrapping the ex-*Franklin* approximately 3½ years later. Peck instituted suit in this court for breach of contract and prevailed on the issue of liability as noted above. In our earlier decision we rejected defendant's argument that its liability would be limited to "refund of the contract price * * * or such portion of the contract price as it may have received" under article 38 of the contract because defendant's actions were in total contravention of article 38 and thus its limitation would not apply. *Peck Iron & Metal Co. v. United States, supra,* 496 F.2d at 555, 204 Ct.Cl. at 403. Defendant's only other major argument which would preclude recovery is that plaintiff failed to mitigate its damages by rebidding on the second contract to scrap the ex-*Franklin.* Our earlier decision on liability made it clear that defendant deliberately sought to conceal its motives and actions from plaintiff, despite plaintiff's efforts to mitigate and avoid any breach at all. For this reason and others outlined by the trial judge, we conclude plaintiff did

not fail to mitigate its damages. Consequently, because no contract clause operates to restrict defendant's liability in this breach situation, plaintiff is entitled to recover anticipated profits, *see Carchia v. United States,* 485 F.2d 622, 202 Ct.Cl. 723 (1973); *North Star Aviation Corp. v. United States,* 458 F.2d 64, 198 Ct.Cl. 178 (1972), and we must determine the approximate benefit to plaintiff had it been permitted to perform the contract.

Essentially there are two methods which can be used to measure plaintiff's damage in this contract breach situation. First, calculations can be performed showing the cost of dismantling the vessel and subtracting these costs from the probable value and receipts obtainable from sale of the vessel's salvageable steel, metal, and equipment. Plaintiff submitted such a calculation at trial and it was found by the trial judge to constitute "precise and detailed proof * * virtually uncontradicted in the record. Defendant's response is general and largely conjectural." The trial judge also stated that "figures pressed by plaintiff in this proceeding are the only figures in the record which are supported by detailed and specific proof." After some minor adjustments of plaintiff's figures, the trial judge concluded that under this method plaintiff would be entitled to damages of $1,950,-122.73. The second method of determining plaintiff's damage is to measure it according to the profits made by the actual salvager of the ex-*Franklin*, Portsmouth Salvage Company. Though it was recognized "the precise amount and even the order of magnitude of that profit is much in doubt" and that Portsmouth's records were incomplete, the trial judge believed this calculation to be a superior gauge of what plaintiff's profit would have been. Largely on the testimony of Mr. Jacobson, Portsmouth's president, that Portsmouth realized more than $400,000 from salvage of the carrier, the trial judge estimated Portsmouth's profit from the ex-*Franklin* project to be $475,000. After an adjustment to compensate for the difference in purchase price between Peck's breached contract and the contract performed by Portsmouth, the trial judge concluded plaintiff suffered $565,794 in damages and recommended this award. 28 U.S.C. § 2503(b) (1976); Ct.Cl. Rule 134(h).

■ The central issue in this case then is which method of calculation provides the most reliable method for estimating Peck's probable profits from scrapping the ex-*Franklin*. Because of the particular facts and circumstances here, we believe that the best method by far is to determine the probable benefit Peck would have received, in dollars, from possession and sale of ex-*Franklin* material and to subtract from this the costs it would have incurred in procuring and dismantling the vessel. To this degree we depart from the trial judge's opinion though we accept, with minor modifications, his estimate of costs and benefits. We note further that we have been handicapped by defendant's failure to offer the court effective tools and evidence with which to assess or refute the detailed submissions of plaintiff. Before this court defendant has relied chiefly on general contentions which were either considered and dismissed during the first proceeding on liability or entertained and forcefully rejected by the trial judge. Faced with compelling and specific facts presented by plaintiff, defendant did little more than urge the court to reject the only record evidence as "fantasy" or "made of whole cloth," or "dream figures," or "figure juggling." Consequently, it has been necessary to make an independent evaluation of the data offered by plaintiff. The rather large award in this case can be better understood with this perspective.

Before proceeding to a particular analysis of Peck's costs and benefits, it is appropriate to discuss more thoroughly the reasons for choosing this method of calculation over the alternative method selected by the trial judge, *i. e.,* estimating what Portsmouth's profits on scrapping the ex-*Franklin* actually were. Such estimating presents a host of problems which were carefully examined by the trial judge. First, it appears Portsmouth was engaged in other ventures while scrapping the ex-*Franklin,* including the

sale of material from certain coal piers and the completion or beginning of other scrapping projects. All during the time it worked on the ex-*Franklin,* Portsmouth pursued its usual day-by-day business of peddling scrap. Second, it is undisputed that as of 1970, even 1976, between 40 to 55 percent of the material from the ex-*Franklin* still remained unsold at Portsmouth's facilities. While this fact does not necessarily lessen the value ex-*Franklin* material would have had to Peck, it certainly complicates the chore of attempting to estimate what Portsmouth's profits on scrapping the ex-*Franklin* were based solely on Portsmouth's tax returns for 1966–70. The fact of this unsold material could indicate either difficulties in sale or a business decision to withhold sale until, in a strong market, prices rose further. But in any event a profit figure cannot be assigned to this scrap. Third, two companies actually participated in the profit from dismantling the ex-*Franklin* : Portsmouth, which had responsibility for reduction and sale of the vessel's metal and steel; and Jacobson Corporation, owned by the same persons who owned Portsmouth, which had responsibility for the sale of the salvageable equipment on board the ex-*Franklin,* valued at over $500,000. Yet only the tax returns of Portsmouth were submitted into evidence; Jacobson Corporation's records were not produced at trial nor was reliable evidence presented concerning Jacobson Corporation's estimated profit. The trial judge admitted Mr. Jacobson's testimony was "difficult to pin down." All of these difficulties are exacerbated by Portsmouth's failure to segregate its costs and receipts according to project. The only reliable evidence available is the tax returns of Portsmouth for the years 1966–70. Yet, even with the benefit of these tax returns, Edwin Jacobson, president of Portsmouth when the ex-*Franklin* was scrapped, steadfastly refused to "pinpoint any of our profits" and spoke of Portsmouth's profits from the ex-*Franklin* only in the most general terms. These difficulties compelled the trial judge to find, and we agree, that "[i]t is not possible to determine from Portsmouth's records what portion of its gross profits was attributable to any particular project."

Nevertheless the trial judge concluded Portsmouth realized a net profit of $475,000 from the scrapping of the ex-*Franklin.* This conclusion was drawn solely from the testimony of Mr. Jacobson, Portsmouth's president, that Portsmouth made a profit of more than $400,000. When pressed for a more specific figure, Mr. Jacobson stated, "Now how much more, that I don't know. I really don't." The trial judge reasoned that since Mr. Jacobson indicated Portsmouth's profit was more than $400,000 he must have meant it was necessarily less than $500,000. Therefore, the trial judge concluded Portsmouth made a profit of $475,000 on salvage of the ex-*Franklin.* We cannot accept this logic. The court has carefully examined Mr. Jacobson's testimony and finds it wholly insufficient to support the conclusion that Portsmouth made a profit of $475,000 from scrapping the ex-*Franklin.* Neither Portsmouth's tax returns, associated data, nor Mr. Jacobson's testimony provides an adequate basis for estimating Portsmouth's profits on the ex-*Franklin* project. Consequently by far the best evidence indicating plaintiff's damage in this case is an estimate of the costs plaintiff would have incurred and the income it would have received in scrapping the ex-*Franklin* had the Government not repudiated the contract. This is the method we adopt to arrive at a damage figure for the Government's breach of the ex-*Franklin* contract. In so doing we do not have to assume that everything would have had to work out to perfection for plaintiff. Complete certainty and mathematical precision is not necessary once the fact of damages has been established. We make here the best approximation of damages based on the best available evidence. *See Petrovich v. United States,* 421 F.2d 1364, 1367, 190 Ct.Cl. 760, 766–67 (1970). *See also Continental Management, Inc. v. United States,* 527 F.2d 613, 619, 208 Ct.Cl. 501, 511 (1975).

## I. *Scrap Value of the ex-Franklin*

The first step in determining plaintiff's damage is to calculate the value of the material and equipment obtainable from the ex-*Franklin*. This figure includes estimation of the weight, in tons, of the various metals and steel constituting the vessel, ferrous and nonferrous, and assigning a value per ton of available material. It is also necessary to decide what value, if any, is attributable to the fact that the Government found unsuitable for its purposes certain steel plating it had required both Portsmouth and Peck, by contract, to specially cut and return to the Government. Because the Government had no need for the steel plating, it sold it back to Portsmouth at allegedly a fraction of its market price. Plaintiff contends its deserves $106,-218 for the benefit *it* would have received from the discovery this armor and steel plating was unsuitable for the Government's purposes. This benefit value also includes the value of major items of salvageable equipment on board the ex-*Franklin* and here there are two subjects of dispute. First, plaintiff complains the trial judge failed to assign a value to a full storeroom of spare parts, allegedly worth $20,000. Second, plaintiff argues it is entitled to $150,000 for "nonsave list" equipment associated with the "save list" turbogenerators which the Government had no right to remove but did. Once the values of the metals, steel, and equipment are determined and combined, the probable costs of procuring and dismantling the ex-*Franklin* can be subtracted to arrive at a damage figure.

*Value of metals and steel: ferrous and nonferrous.* It may be thought that calculation of the kind, tonnage, and value of the metals comprising a vessel weighing approximately 30,000 tons would be a difficult task. The chore has been made easier in this case because the ex-*Valley Forge,* a sister carrier of the ex-*Franklin,* was sold for scrap to a shipbreaker in Richmond, California, in 1971. On the basis of the materials recovered from the ex-*Valley Forge,* a reasonable approximation can be made as to the quantities of nonferrous metals on board the ex-*Franklin* and available for recovery under the terms of plaintiff's contract. Had plaintiff scrapped the ex-*Franklin,* it would have obtained the following quantities of nonferrous metals:

| | Net tons |
|---|---|
| No. 1 copper | 150 |
| No. 2 copper | 150 |
| Monel | 45 |
| Cupro-nickel | 255 |
| Hi-grade brass | 400 |
| Red brass | 80 |
| Yellow brass, admiralty, manganese brass | 120 |
| Total | 1,200 |

Based upon plaintiff's actual sales of metals during the period it would have scrapped the ex-*Franklin* and the average selling prices for the metals at that time, the quantities of nonferrous metals listed above would produce the following dollar amounts:

| | |
|---|---|
| No. 1 copper | $ 192,900 |
| No. 2 copper | 167,196 |
| Monel | 53,100 |
| Cupro-nickel | 321,300 |
| Hi-grade brass | 447,200 |
| Red brass | 70,800 |
| Yellow brass, admiralty, manganese brass | 62,400 |
| Total value nonferrous metals | $1,314,896 |

*Ferrous metals.* The following quantities of the comparatively less valuable ferrous metals were on board the ex-*Franklin* and available for recovery under the terms of plaintiff's contract:

| | Long Tons[1] |
|---|---|
| No. 1 ship scrap | 10,645 |
| Rerolling ship plate | 7,500 |
| Armour plate (nickel bearing) | 379 |
| Total | 18,524 |

Sale of these materials during the time plaintiff would have scrapped the ex-

---

1. A "long" ton equals 2,240 pounds as distinguished from a "net" or "short" ton which equals 2,000 pounds.

*Franklin* would have produced the following dollar amounts:

No. 1 ship scrap ................... $361,717
Rerolling ship plate ............... 363,075
Armour plate (nickel bearing) ....... 56,850
Total value ferrous material ........ $781,642

■ Our figures estimating the quantity of ferrous metals differ from the trial judge's in one major respect. As noted, under the terms of the contract, plaintiff was to cut and prepare but return to the Government approximately 5,000 long tons of steel plating for use as radiation shielding. When the ex-*Franklin* was actually scrapped, much of this "save list" steel plating was found unsuitable for use as shielding and sold back to Portsmouth. The trial judge gave plaintiff credit for some of this unsuitable steel plating, determining that approximately 2,773 long tons would be available for plaintiff's own sale. We believe the proper approach in this case, as a matter of law, is to calculate damages according to the terms of the contract as awarded, not in view of the subsequent discoveries of Portsmouth. Thus our calculations assume plaintiff would have had to incur costs associated with recovering this steel plating, approximately 5,000 long tons, but since it was to be returned to the Government it may not be included in fixing the quantity and value of material available to plaintiff under the terms of the contract. This reasoning also compels the conclusion that plaintiff is not to be credited with any benefit which it may have received had it been able to buy back the steel plating at allegedly a bargain price, as plaintiff contends Portsmouth was able to do. This advantage of Portsmouth's was clearly not contemplated under Peck's contract. Nor could the Government have reasonably anticipated that deprivation of this purported benefit would be a result of its breach of contract. As far as plaintiff is concerned, the unsuitability of the steel plating is an unforeseeable, fortuitous discovery redounding to its benefit long after contract breach. What plaintiff is seeking is not actually compensatory damage but a species of unforeseeable consequential damages. *Northern Helex Co. v. United States,* 524 F.2d 707, 720–21, 207 Ct.Cl. 862, 886–88, 896 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976). Plaintiff deserves no compensation for this portion of the claim.

The third component of value, in addition to probable receipts from disposal of non-ferrous metals and ferrous metals, is the value of the salvageable equipment on board the ex-*Franklin*. As noted above, it was Jacobson Corporation, a sister company of Portsmouth, which sold this equipment from the ex-*Franklin*. Since no records from Jacobson Corporation were submitted as evidence during trial it has been necessary to rely on other evidence to ascertain the value of these items. The major items of salvageable equipment on board the ex-*Franklin* with ascertainable value were:

| | | |
|---|---|---|
| Air & refrigeration compressors ...... | | $ 7,500 |
| Boilers (8) ...................... | | 22,500 |
| Diesel pumps (4) ................. | | 6,000 |
| Distilling plants (2) | | |
| 40,000 gal. per day .............. | | 50,000 |
| Electric motors .................. | | 7,500 |
| Machine tools: | | |
| 14″ Reed-Prentice lathes | | |
| (2) ................. | $7,500 | |
| 16″ Nebel machine lathe .. | 4,000 | |
| Cincinnati radial drill ..... | 2,250 | |
| Kearney-Tucker milling | | |
| machine .............. | 1,500 | |
| | | 14,750 |
| Motor generator sets, 125 kw. | | |
| (2) ............................ | | 6,500 |
| Pumps (feed water, fuel, & | | |
| gasoline) ...................... | | 12,500 |
| Switchgear & motor | | |
| controllers .................... | | 22,500 |
| Valves: | | |
| Brass—75 net tons ..... | $75,000 | |
| Steel—250 net tons ...... | 75,000 | |
| | | 150,000 |
| Van-axial fans .................... | | 270,000 |
| Watertight doors .................. | | 9,000 |
| Windlasses, winches, & | | |
| capstans ...................... | | 12,500 |
| Total .......................... | | $591,250 |

This is the finding of the trial judge, with which we agree. But plaintiff has two objections to this finding. First, plaintiff complains that no value has been assigned to a full storeroom of spare parts on board

the ex-*Franklin* worth at least $20,000. Though plaintiff cites portions of the record allegedly supporting the $20,000 figure, a careful reading shows this value does not relate exclusively to spare parts. The most specific testimony addressing the issue was given by Mr. Jacobson who stated, "I remember in the way of *big equipment* we sold the *machine shop* for some twenty thousand dollars." [Emphasis added.] Now the storeroom of spare parts may have been part of the machine shop, but the record does not demonstrate it was the entire machine shop. The record is unclear. Under these circumstances it was reasonable for the trial judge to refuse to assign an independent value to the spare parts storeroom.

Plaintiff's second objection relates to the value of certain "nonsave list" items associated with the "save list" turbogenerators which plaintiff was to remove and return to the Government. The facts surrounding this auxiliary equipment are detailed in the court's first decision on liability, *Peck Iron & Metal Co. v. United States, supra*, 496 F.2d at 549–53, 204 Ct.Cl. at 393–99. In summary, under its contract plaintiff was to remove and return to the Government four GE 1250 kw. turbogenerators on board the ex-*Franklin* within 2 years after August 1965. In October 1965 the Navy determined the turbogenerators would be needed much earlier to provide power for instrumentation ships used in the *Apollo* program and subsequently cancelled plaintiff's contract to meet this need. Plaintiff's contract did *not* require it to return certain "nonsave list" items such as condensers, pumps, air ejectors, piping systems and voltage regulator sections associated with the "save list" turbogenerators. But when the *Apollo* program requirements developed, it was decided the associated "nonsave list" items would be needed along with the turbogenerators. After plaintiff's contract was cancelled, the "nonsave list" auxiliary equipment was removed from the ex-*Franklin* with the turbogenerators before the vessel was again made available for scrapping. Plaintiff now maintains that under its contract it was entitled to retain for scrapping the "nonsave list" auxiliary equipment and that this equipment was worth approximately $150,000 with, at the very least, a scrap value of $110,000. The trial judge dismissed plaintiff's claim for this amount as speculative at best. We believe the only conclusion supported in the record is that the auxiliary equipment had a scrap value to plaintiff of $110,000. It would be incorrect to assign the higher value of $150,000 since this auxiliary equipment, without the turbogenerators, probably had little value except as scrap. Record testimony demonstrates that the minimal value of the auxiliary equipment, as scrap, was $110,000, in excess of the cost of removing the equipment from the vessel. This evidence was not contradicted specifically, but merely labeled hypothetical. We must prefer detailed record evidence over the unsubstantiated charge of speculation and therefore assign plaintiff a value of $110,000 for the auxiliary equipment, "nonsave list" items, which would have been available to plaintiff had the Government not breached its contract.

In summary, given the quantities set forth above, the average market prices during the time these metals would have been sold, the value of the salvageable equipment on board the ex-*Franklin* and the value of the "nonsave list" items, plaintiff would have realized a gross return from salvage of the ex-*Franklin* of $2,797,788, under the terms of its contract, computed as follows:

| | |
|---|---|
| Nonferrous metals ............... | $1,314,896 |
| Ferrous metals ................. | 781,642 |
| Salvageable equipment ........... | 591,250 |
| Nonsave list items removed by Government ..................... | 110,000 |
| Total ........................ | $2,797,788 |

II. *Estimated Costs of Procurement and Dismantling*

The figure of $2,797,788 is only the estimate of gross receipts and total value of the material on board the ex-*Franklin*. To arrive at an estimate of the total benefit

plaintiff would have received had the Government not breached its contract, it is necessary to subtract from this figure the sums plaintiff would have expended in purchasing the vessel, towing it to its yard and reducing it to scrap in disposable form. The procedure by which this is done is to first arrive at an estimate of how much it would have cost plaintiff, per net ton, to scrap the ex-*Franklin*. As illustrated below the best estimate is a cost of $23.188 per net ton. This figure is then multiplied by the total net tonnage of material (both equipment and metallics) comprising the ex-*Franklin* which plaintiff would have had to prepare as scrap. Finally, there is a question raised by the trial judge and disputed by plaintiff of whether the sums spent by plaintiff toward scrapping the ex-*Franklin* prior to the Government's breach, $79,702.62, have been included in the cost per ton multiplied by total tonnage calculation or whether these costs are to be added on to plaintiff's cost of performance.

*Contract award price and towing costs.* There is no dispute that plaintiff would have been required to pay the Government, under its contract, $137,206 for the right to scrap the ex-*Franklin*. Nor is it questioned that plaintiff would have incurred $28,000 in towing costs to bring the ex-*Franklin* from its berth in Bayonne, New Jersey, to its yard in Portsmouth, Virginia.

*Costs per net ton which plaintiff would have incurred dismantling the ex-Franklin.* Figuring the total cost per net ton for dismantling begins with estimating the costs for direct labor, per net ton, and then adding to this cost a percentage of the direct labor costs based on the historical percentage relation of all other costs plaintiff has incurred to its direct labor costs. The cost of direct labor per net ton is determined by estimating direct labor costs for one week on the assumption that a 17-man scrapping crew working a 40-hour week will generate 120 net tons of scrap per week. As the trial judge found and as the best evidence in the record indicates, the following kinds and number of workers would have been required to generate 120 tons of scrap per 40-hour week:

| | On water | On land | Joint | Total |
|---|---|---|---|---|
| Burners | 3 | 4 | — | 7 |
| Laborers | 2 | 2 | — | 4 |
| Riggers | — | — | 1 | 1 |
| Crane operators | — | — | 1 | 1 |
| Metal sorters | — | 1 | 1 | 2 |
| Supervisors | 1 | 1 | — | 2 |
| | | | | 17 |

Support for the estimate of the need for a 17-man scrapping crew is found in the fact that when Portsmouth actually performed the scrapping of the ex-*Franklin* it used a maximum crew of 15 men. The figure of 120 tons of scrap per week is similarly supported since when Portsmouth scrapped the ex-*Franklin*, it produced a minimum of 26,000 net tons of scrap in 3½ years or at a rate of 142.8 tons per week. Viewed in this perspective, the estimate of a 17-man crew producing 120 tons per week is more conservative and would in fact be a more expensive estimate of the project's cost than as experienced by the actual scrapper of the ex-*Franklin*.

The wages for plaintiff's employees during the year it would have been dismantling the ex-*Franklin* were:

| Classification | 1965 | Per | 1966 | Per | 1967 | Per |
|---|---|---|---|---|---|---|
| Burners | $1.40– | 1.60 hr. | $1.35– | 1.60 hr. | $1.50– | 1.75 hr. |
| Laborers | | 1.30 hr. | | 1.30 hr. | 1.40– | 1.50 hr. |
| Riggers | 1.35– | 1.70 hr. | 1.35– | 1.45 hr. | 1.40– | 1.70 hr. |
| Crane operators | 1.60– | 1.70 hr. | 1.50– | 1.70 hr. | 1.55– | 1.80 hr. |
| Metal sorters | 1.40– | 1.55 hr. | 1.40– | 1.55 hr. | 1.55– | 1.70 hr. |
| Supervisors | 125.00–250.00 wk. | | 125.00–250.00 wk. | | 125.00–175.00 wk. | |
| Mechanics | | 2.30 hr. | | 2.30 hr. | | 200.00 wk. |

Based on an average of the above pay rates, these workers would have been paid the following amounts for a 40-hour week:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7 Burners | × | $ 1.54 hr. | × | 40 hrs. | = | $ 431.20 |
| 4 Laborers | × | 1.343 hr. | × | 40 hrs. | = | 214.88 |
| 1 Rigger | × | 1.443 hr. | × | 40 hrs. | = | 57.72 |
| 1 Crane operator | × | 1.687 hr. | × | 40 hrs. | = | 67.48 |
| 2 Metal sorters | × | 1.50 hr. | × | 40 hrs. | = | 120.00 |
| 2 Supervisors | × | 174.58 wk. | × | 40 hrs. | = | 349.16 |
| Total | | | | | | $1,240.44 |

Hence, Peck's direct labor costs in scrapping the ex-*Franklin* would have been $1,240.44 per week to generate 120 tons of scrap. To arrive at a total per ton cost figure, it is necessary to add to the direct labor costs a percentage thereof as a factor representing administrative and mechanical expenses. Then to this subtotal figure is added another percentage, which represents all other costs which would have been incurred during contract performance. Accepting the percentage figures as found by the trial judge, the following computation results:

| | |
|---|---|
| Direct labor costs | $1,240.44 |
| Add 20 percent administrative and mechanical expenses | 248.09 |
| Subtotal (labor costs) | 1,488.53 |
| Add 86.93 percent of total labor costs for other expenses | 1,293.98 |
| Total expenses per week | $2,782.51 |

If Peck's total expenses per one week of operation are estimated at $2,782.51 and from this one week 120 tons of recoverable scrap will be produced, then it would have cost plaintiff $23.188 per net ton to scrap the ex-*Franklin*. Defendant's main objection is that the 86.93 percent addition to total labor costs could not possibly cover all other costs which may have been encountered. Defendant did not attempt to explain specifically why the 86.93 percent add-on figure was erroneous, but simply insisted that these cost figures were made of "whole cloth." In the first place we are unable to give much weight to an objection so generalized. Second, addition of 86.93 percent to total labor costs as a factor covering all other costs is supported by Peck's actual experience during the period it would have scrapped the ex-*Franklin* and by the experience of Portsmouth. Peck's historical expenses of operation may be divided into "total labor costs" and "all other expenses." The record shows that for the fiscal years of Peck Iron and Metal Co., Inc., 1964–68, "all other expenses" averaged 86.93 percent of total labor costs. Therefore, to determine Peck's total cost for a particular project, 86.93 percent can be added to the estimated total labor costs to arrive at a final total cost figure. The 86.93 percent figure is derived from an average of *all* costs incurred each year over a 5-year period. Of necessity, it includes all the costs plaintiff was likely to incur in scrapping the ex-*Franklin*. Plaintiff's cost and labor figures were verified by an FBI audit. Furthermore, Portsmouth's federal and state income tax returns for 1967–70, the years covering the period it scrapped the ex-*Franklin*, reveal that its "all other expense" category was an average of 79.78 percent of total labor costs. Thus, assuming total expenses for Peck's operation per week to be $2,782.51 and further assuming 120 tons of scrap would be produced during one week of operation, it would have cost plaintiff $23.188 per net ton to scrap the ex-*Franklin*.

Defendant protests strongly against acceptance of this figure of $23.188 per ton, yet does so only in general and vague terms. Defendant urges that the $50 per ton cost estimate of its expert, Boyd Outman, a consultant for scrapping operations, should be accepted instead. Mr. Outman's estimate, based on an inspection of the ex-

*Franklin* at the same time plaintiff inspected it, was that it would cost approximately $1,500,000 to scrap. Mr. Outman is not a shipbreaker and lacks detailed knowledge of plaintiff's scrapping operation. Also, the estimate of $50 per ton for recovery, as the trial record reveals, appears to be a general, ballpark figure. It was not buttressed with specific proof as offered by plaintiff. On the other hand, plaintiff presented a witness, Mr. Gottlieb, with many years of experience in shipbreaking and intimate knowledge of plaintiff's scrapping operation. Even counsel for defendant recognized during trial that, "Mr. Gottlieb has great experience in the scrap industry." Mr. Gottlieb's estimate of $23.188 per ton was based on precise evidence of the number and kind of workers necessary to do the job, their wages, and the time necessary to perform. Mr. Outman's prediction of merely a "breakeven" or "minus" figure for scrapping is refuted by the fact that Portsmouth made a sizable profit on the ex-*Franklin* project; whereas the estimate of $23.188 per ton is supported by the fact that during the time plaintiff would have scrapped the ex-*Franklin* it was experiencing *actual costs* "from $20 to $24 to $25 a ton on the basis of a through shift." Furthermore, cross-examination at trial of Mr. Gottlieb's testimony concerning the $23.188 per ton figure did nothing to diminish its soundness. Finally, defendant generally insists plaintiff lacked the site or facilities necessary to scrap a vessel as large as the ex-*Franklin*. Yet evidence indicates Peck's facilities were either equal or superior to those of Portsmouth, the actual scrapper. For these reasons, we conclude the estimated cost to Peck of $23.188 per ton to scrap the ex-*Franklin* is fully supported by the record and is by far the best evidence of what its costs would have been had the Government not breached the contract.

Next it is necessary to multiply the cost per ton figure by the number of tons of material plaintiff would have been required to prepare as scrap under its contract. The trial judge selected a figure of 29,000 net tons, the approximate total weight of the ex-*Franklin*. Plaintiff protests the correct figure should be the total number of *recoverable* tons, a figure closer to 26,000 net tons, the difference consisting of worthless material such as wood, wiring, and insulation. Yet plaintiff's lower figure does not account fully for the 5,000 long tons of steel plating which under its contract were to be returned to the Government for use as radiation shielding and thus would not have been available to plaintiff for its own sale. Viewed in terms of plaintiff's contract as awarded (*not* in light of subsequent discoveries) this steel plating must be treated as a cost factor to plaintiff with no corresponding benefit. Hence the tonnage plaintiff would have been required to prepare as scrap under its contract is calculated as follows:

|  | Net tons |
|---|---|
| Nonferrous metals | 1,200 |
| Ferrous metals | 26,521 [2] |
| Equipment | 1,120 [2] |
| Total tonnage of material to prepare as scrap | 28,841 |

With a figure of 28,841 net tons of scrap material, we arrive at a total dismantling cost of $668,765. Thus, plaintiff's total performance costs may be summarized as follows:

| | |
|---|---|
| Contract award price | $137,206 |
| Towing cost | 28,000 |
| Dismantling costs | 668,765 |
| Total cost of performance | $833,971 |

To this figure the trial judge added $79,-702.62, sums plaintiff expended preparing to scrap the ex-*Franklin* prior to the Government's breach. The question is whether these expenses were in effect capitalized and thus already included in the figure for total costs of dismantling based on direct labor costs. Exhibits introduced at trial and trial testimony indicate this

---

**2.** Figure converted from long-ton figure.

sum consisted of money for employee wages, equipment expenditures, and installation of track for preparation of the berthing and dismantling sites. They are either depreciable capital expenditures or regular expense items as wages. It has been demonstrated above that the 86.93-percent addition to direct labor costs encompasses all other expenses which Peck would have incurred during dismantling. Therefore it must be assumed the $79,702.62 is distributed among costs falling within this percentage addition; trial testimony, indicating these costs were in fact capitalized, supports this assumption. Therefore it is incorrect to add this sum to plaintiff's costs.

A summary of the above figures provides the final damage sum.

I. Value of materials obtainable from scrapping the ex-*Franklin* under plaintiff's contract:

| | | |
|---|---|---|
| Ferrous metals | $ 781,642 | |
| Nonferrous metals | 1,314,896 | |
| Salvageable equipment | 591,250 | |
| Nonsave list items removed by Government | 110,000 | |
| Total value | | $2,797,788 |

II. Costs of procuring and dismantling the ex-*Franklin*:

| | | |
|---|---|---|
| Contract award price | 137,206 | |
| Towing cost | 28,000 | |
| Dismantling costs | 668,765 | |
| Total cost of performance | | 833,971 |
| Total damage to Peck from breach of ex-*Franklin* contract by the Government | | $1,963,817 |

Award of $1,963,817 is indeed a large award. Yet if we are to base our decision on record evidence, we can reach no other conclusion. The special circumstances encountered in presentation of this case to the court, which we have reviewed, significantly affect the amount awarded. Finally, we note that the trial judge performed calculations similar to those contained herein, from which we have drawn heavily, and arrived at a similar damage figure. But the trial judge rejected this detailed evidence in favor of the comparatively weak and general testimony regarding Portsmouth's profits given by Mr. Jacobson. This we find untenable and choose instead the more reliable method of damage calculation set forth above.

made a part of the judgment herein, the court concludes as a matter of law that plaintiff, Peck Iron and Metal Co., Inc., suffered damages in the amount of one million nine hundred sixty-three thousand eight hundred seventeen dollars ($1,963,817) as a result of defendant's breach of contract to scrap the ex-*Franklin*, and judgment is hereby entered for plaintiff in that amount.

## CONCLUSION

Upon the foregoing opinion, containing the necessary findings of fact which are