*This opinion is subject to revision before*
*publication in the Pacific Reporter*

**2016 UT 27**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

TRANS-WESTERN PETROLEUM, INC.,
*Appellant,*

*v.*

UNITED STATES GYPSUM COMPANY,
*Appellee.*

No. 20140453
Filed June 16, 2016

On Certification from the
United States Court of Appeals for the Tenth Circuit
The Honorable Paul J. Kelly, Jr.
Case Nos. 13-4012 and 13-4021

Attorneys:

Thomas W. Clawson, Stephen K. Christiansen,
Salt Lake City, for appellant

Patricia W. Christensen, Matthew J. Ball,
Salt Lake City, for appellee

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
and JUDGE ORME joined.

Having been recused, JUSTICE DURHAM did not participate herein:
COURT OF APPEALS JUDGE GREGORY K. ORME sat.

JUSTICE JOHN A. PEARCE became a member of the Court
on December 17, 2015, after oral argument in this matter,
and accordingly did not participate.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶ 1    The following question is before us upon certification
from the United States Court of Appeals for the Tenth Circuit:

"How should expectation damages be measured for the breach of an oil and gas lease?" For reasons detailed below, we hold that expectation damages for the breach of an oil and gas lease are measured in much the same way as expectation damages for the breach of any other contract. Such damages may include general (or direct) and consequential (or special) damages. "[G]eneral damages are those that flow naturally from the breach . . . ." *McCleve Props., LLC v. D. Ray Hult Family Ltd. P'ship*, 2013 UT App 185, ¶ 17, 307 P.3d 650 (citation omitted). Within the context of this case, we measure general damages as the difference between the contract price of the lease and the market value of the lease at the time of the breach. Consequential damages, on the other hand, are those that are "reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." *Id.* (citation omitted). And we measure consequential damages "not by the value of the promised performance alone but by the gains such performance could produce for collateral reasons, or the loss that is produced by the absence of such performance." DAN B. DOBBS, LAW OF REMEDIES § 12.1(1) (2d ed. 1993). We further hold that trial courts may, in their discretion, allow the use of post-breach evidence to help establish and measure expectation damages.

## BACKGROUND

¶ 2    The Tenth Circuit case at issue concerns Trans-Western Petroleum, Inc. (Trans-Western), a Colorado corporation involved in the buying and selling of oil and gas leases, and United States Gypsum Company (U.S. Gypsum), a Delaware corporation that owns the oil and gas beneath 1,720 acres in Sevier County, Utah. In August 2004, Trans-Western contacted U.S. Gypsum and expressed interest in an oil and gas lease for a section of its acreage in Sevier County. At the time, the oil and gas interest for that section of land had been leased to other parties, who had assigned their leasehold interest to an entity known as Wolverine. This preexisting lease, known as the "Wolverine lease," was due to expire on August 17, 2004. U.S. Gypsum agreed to lease that oil and gas interest to Trans-Western for a term of five years starting on August 17, 2004, and executed the lease on September 15, 2004.

¶ 3    But within weeks of the execution of the lease, U.S. Gypsum breached the Trans-Western lease because of Wolverine's assertion that the Wolverine lease was still in force. The underlying events are not in dispute. On October 1, 2004,

2

Wolverine informed Trans-Western by letter that Wolverine believed its lease was still in force and that it did not recognize Trans-Western's interest in the property. Wolverine also sent U.S. Gypsum a copy of the letter. Upon receiving the letter from Wolverine, U.S. Gypsum sent a letter dated October 7, 2004, to Trans-Western purporting to rescind the lease between the parties "on the basis of a mistake of fact with respect to the status of the Wolverine [l]ease."

¶ 4 After this attempted unilateral rescission by U.S. Gypsum, Trans-Western filed suit in September 2006 for declaratory judgment and damages against Wolverine, U.S. Gypsum, and another party[1] in federal district court. The parties agreed that the court would first address the validity of the Wolverine lease, and U.S. Gypsum did not participate in the briefing on that issue. The federal district court determined that the Wolverine lease ended in August 2004. On appeal, this determination was upheld by the Court of Appeals for the Tenth Circuit. After settlement of the issue regarding when the Wolverine lease ended, Trans-Western pursued an amended complaint in the federal district court asserting claims against U.S. Gypsum for breach of contract and breach of the covenant of quiet enjoyment.

¶ 5 The district court issued its findings of fact and conclusions of law on November 29, 2012, and a final judgment on December 27, 2012. The court found that the Trans-Western lease was valid as of August 17, 2004, that U.S. Gypsum had wrongfully rescinded the lease, and that the rescission constituted a breach of contract and a breach of the covenant of quiet enjoyment. The court also established that the value of the Trans-Western lease did not change between the execution of the lease on September 15, 2004, and the breach of the lease on October 7, 2004. In light of these findings, the district court awarded nominal damages of one dollar to Trans-Western for its claim for breach of contract. After the parties appealed to the Court of Appeals for the Tenth Circuit, the Court of Appeals certified to us the question of

---

[1] Other parties were added to the suit in January 2007; however, none of these unnamed parties are involved in the certified question before this court.

how to measure expectation damages for the breach of an oil and gas lease.

## STANDARDS OF REVIEW

¶ 6    "On a certified question, we are not presented with a decision to affirm or reverse, and traditional standards of review do not apply. Therefore, [o]n certification, we answer the legal questions presented without resolving the underlying dispute." *Garza v. Burnett*, 2013 UT 66, ¶ 9, 321 P.3d 1104 (alteration in original) (citation omitted).

## ANALYSIS

¶ 7    U.S. Gypsum asserts that the appropriate measure of damages for its breach of the oil and gas lease should be based on the value of the lease at the time of the breach. The measure U.S. Gypsum urges us to adopt is essentially the same as the one used for measuring general damages for the breach of a contract to sell real estate, "with appropriate adjustments in the form of words used": general damages for the breach of such a contract are measured as the difference between the price paid for the lease and the market value of the lease at the time of breach. DAN B. DOBBS, LAW OF REMEDIES § 12.15(2) (2d ed. 1993). Trans-Western claims that this measure of damages would fail to place it, as the nonbreaching party, "in as good a position as if the contract had been performed." Instead, Trans-Western argues that the measure of damages should be based on an amount that it could have sold the lease for during the period of the lease. Trans-Western further argues that, in applying this measure, courts should allow "consideration of the best evidence available, including post-breach evidence."

¶ 8    We hold that the appropriate measure of expectation damages for the breach of an oil and gas lease is much the same as the measure of expectation damages for a breach of contract and may include both general and consequential damages. We measure general damages in the context of this case as the difference between the contract price of the lease and the market value of the lease at the time of breach.[2] And we measure

---

[2] Courts usually measure general and consequential damages at the same time. *See generally Fifth Third Bank v. United States*, 518 F.3d 1368 (Fed. Cir. 2008). But this is not always the case. For

(cont.)

consequential damages "not by the value of the promised performance alone but by the gains such performance could produce for collateral reasons, or the loss that is produced by the absence of such performance." DOBBS, LAW OF REMEDIES § 12.1(1). We also hold that courts have discretion to permit parties to introduce post-breach evidence to establish and measure their expectation damages.

## I. EXPECTATION DAMAGES FOR THE BREACH OF AN OIL AND GAS LEASE ARE MEASURED THE SAME WAY AS EXPECTATION DAMAGES FOR A BREACH OF CONTRACT

¶ 9    It is well established under Utah law that, generally speaking, leases are treated the same way as other contracts. *See Richard Barton Enters., Inc. v. Tsern*, 928 P.2d 368, 376 (Utah 1996) ("[P]rinciples of contract law rather than property law govern[] the law of damages in computing a lessee's liability for damages for breach of a lease."); *Reid v. Mut. of Omaha Ins. Co.*, 776 P.2d 896, 904 (Utah 1989) (recognizing the "modern view that leases are essentially commercial transactions, contractual in nature"); *Hall v. Warren*, 632 P.2d 848, 850 (Utah 1981) ("This obligation is in accord with the contemporary approach toward leased

---

instance, with respect to consequential lost profits, it has been said that "the rule favoring the measurement of damages as of the time of the breach does not apply . . . to anticipated profits or to other expectancy damages that, absent the breach, would have accrued on an ongoing basis over the course of the contract." *Anchor Sav. Bank, FSB, v. United States*, 597 F.3d 1356, 1369 (Fed. Cir. 2010) (alteration in original) (internal quotation marks omitted). In circumstances such as those, "damages are measured throughout the course of the contract." *Id.* (citation omitted). This same logic applies to damages from a continuing breach. Such damages are not measured "immediately after the initial injury [because that] would be unduly restrictive and would not compensate plaintiffs fully for their injury." *Brighton Homes, Inc. v. McAdams*, 737 S.W.2d 340, 343 (Tex. Ct. App. 1987). Rather, if "a continuing breach . . . [is] a continuing cause of damage," a court may measure the damage "up until the time of trial." *Id.* Moreover, the measure of general damages may vary depending on the nature of the breach. *See* DAN B. DOBBS, LAW OF REMEDIES § 12.15(3).

habitations which emphasizes the contractual nature of the relationship between the landlord and tenant instead of viewing a lease simply as [a] demise of real estate."). Accordingly, if an oil and gas lease is just a lease, under our precedent we treat an oil and gas lease as any other contract, barring some persuasive reason to do otherwise.

¶ 10  The strictest view among authorities is that "the oil and gas lease is not really a lease anywhere," HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW § 414 (2015) (citation omitted)—that because "an oil and gas lease is not a 'lease,' . . . an analogy between an oil and gas lease and an ordinary lease . . . cannot represent the law," A. W. Walker, Jr., *The Nature of the Property Interests Created by an Oil and Gas Lease in Texas*, 7 TEX. L. REV. 539, 559 & n.83 (1929). A somewhat softer view that does not reject all similarities to a normal lease sees an oil and gas lease as more similar to a real-estate deed than "an ordinary real-property lease." JOHN S. LOWE ET AL., OIL AND GAS LAW 181 (6th ed. 2013).[3]

¶ 11  Since an oil and gas lease is either not a lease or at most a quasi-lease, authorities have warned that oil and gas interests "should not be handled within the straitjacket of common law concepts." WILLIAMS & MEYERS, OIL AND GAS LAW § 213 (2015).[4] Instead, some have urged courts to flesh out the law of oil and gas leases as specific issues arise in litigation rather than adopt "an

---

[3] *See also* 2 EUGENE KUNTZ, OIL AND GAS § 18.2 (1989) ("The instrument is called an oil and gas *lease*, but the word 'lease' should not be taken as a technical term which carries with it all of the law relating to landlord and tenant."); *Unit Petroleum Co. v. David Pond Well Serv., Inc.*, 439 S.W.3d 389, 396 (Tex. Ct. App. 2014) (noting that "an oil and gas 'lease' is not a lease in a traditional sense").

[4] *See also* 2 KUNTZ, OIL AND GAS § 25.1 (1989) ("[C]onsiderable difficulty is encountered in applying common law concepts regardless of the nature of the lessee's interest under the theory entertained in the particular jurisdiction."); *Lynch v. State Bd. of Equalization*, 210 Cal. Rptr. 335, 337 (Ct. App. 1985) ("[C]ourts [have] attempted to fashion rules of law [for oil and gas leases] by analogies drawn from other fields of law which were often inapt for comparison.").

early arbitrary classification" that essentially determines all future aspects of such a lease. 2 EUGENE KUNTZ, OIL AND GAS § 23.2 (1989).[5]

¶ 12 Given the *sui generis* nature of oil and gas leases, courts have deemed attempts to classify oil and gas interests "as thorny a problem as has challenged the ingenuity and wisdom of legislatures [and courts]." *Lynch,* 210 Cal. Rptr. at 337 (citing *R.R. Comm'n v. Rowan & Nichols Oil Co.,* 310 U.S. 573, 579 (1940) (alteration in original)). With this in mind it is not surprising that there is a lack of consensus as to how to classify such a lease and which law should govern.[6] For instance, while jurisdictions generally treat oil and gas leases as both a contract and a conveyance,[7] courts classify the rights attached to such a "lease" quite differently. LOWE ET AL., OIL AND GAS LAW 177, 181 (6th ed. 2013). Thus, in some jurisdictions the lessee's interest is "a fee simple determinable estate in the oil and gas in place," whereas other courts characterize "the interest as a grant of an irrevocable license or *profit a prendre.*" *Id.* at 181. And usually these classifications are based "upon whether the state follows an ownership-in-place or exclusive-right-to-take theory of oil and gas rights." *Id.* These varying classifications can matter because they

---

[5] *See also Heiner v. S.J. Groves & Sons Co.*, 790 P.2d 107, 113 (Utah Ct. App. 1990) ("Many legal scholars contend that landlord-tenant or real property law concepts should not be mechanically applied in mining and oil and gas cases.").

[6] *See* 2 KUNTZ, OIL AND GAS § 18.2 (1989) ("The oil and gas lease and the rights created thereby have been variously classified by the courts for various reasons. The classifications are so numerous and so inconsistent that a single classification of the oil and gas lease for all purposes is not possible. . . . It can only be said that the rights under an oil and gas lease have been classified as realty, personalty, chattel real; as corporeal or incorporeal; as fees, profits, or licenses, depending upon the purpose for which the classification is made and depending upon the terminology used to describe rights in oil and gas under the theory of ownership entertained in the particular jurisdiction.").

[7] *See id.* ("The oil and gas lease . . . is a conveyance of an interest in real property . . . . It is also an executory contract . . . .").

"often determine[] the nature and extent of the lessee's rights."[8] *Id.* And this has led various jurisdictions to "rel[y] on the areas of contract law, property law, landlord-tenant law, oil and gas law and vendor-purchaser law with differing results." *Heiner v. S.J. Groves & Sons Co.,* 790 P.2d 107, 113 (Utah Ct. App. 1990).

¶ 13 With that in mind, however, we do not see that the specific classifications of the oil and gas lease in various jurisdictions make any difference as to the type of expectation damages available when a contract is breached in the oil and gas context. We are aware of no jurisdiction that has carved out a special rule for oil and gas leases with respect to the formulation of the measure of expectation damages. And we can imagine no theoretical reason for doing so. We therefore, for the limited purpose of expectation damages in a breach of contract claim, will treat oil and gas leases as we would treat any other lease under Utah law.[9] And we do not reach more fundamental questions of exactly how to classify an oil and gas lease and which law applies outside of the narrow certified question we answer here.[10]

---

[8] For instance, "a *profit a prendre* or a license is incorporeal and nonpossessory," and thus "the interest may be abandoned and is not subject to the possessory remedies of trespass and ejectment." JOHN S. LOWE ET AL., OIL AND GAS LAW 181–82 (6th ed. 2013). Accordingly, "[t]he lessee's interest must be protected by nonpossessory actions, such as a quiet title suit." *Id.* at 182. On the other hand, "if a state's courts classify the leasehold interest as a fee simple estate . . . then the interest is corporeal and possessory in nature," which means that "the common law rules of abandonment should not apply, but the possessory remedies of trespass and ejectment will be available." *Id.* Furthermore, "how the courts classify the leasehold interest may also have substantial bearing upon the application of statutory provisions governing taxation, intestate succession, and judgment liens." *Id.*

[9] Trans-Western argues that the covenant of quiet enjoyment is also implicated in the question the Tenth Circuit certified to us. We do not read the question that way and thus do not reach any issues regarding the breach of that covenant in the context of an oil and gas lease.

[10] This opinion should not be read to extend our conclusions as to which law applies beyond the narrow realm of expectation

(cont.)

Consequently, we turn to our contract jurisprudence to aid in our determination of the proper measure of expectation damages for the breach of an oil and gas lease.

¶ 14 Utah law provides the injured party in a breach of contract action with "a right to damages based upon his expectation interest." *TruGreen Cos., L.L.C. v. Mower Bros., Inc.*, 2008 UT 81, ¶ 10, 199 P.3d 929 (citation omitted). This expectation interest is generally measured by "(a) the loss in the value . . . of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss . . . avoided by not having to perform." *Id.* (citation omitted).[11]

¶ 15 Our courts have alternatively, but equally correctly, defined expectation damages as including "those flowing naturally from the breach" (general damages) and "those reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made" (consequential damages). *Machan v. UNUM Life Ins. Co. of Am.*, 2005 UT 37, ¶ 15,

---

damages in a breach of contract claim for an oil and gas lease. "In Utah, the nature of the interest created by an oil and gas lease has not been determined." 2 KUNTZ, OIL AND GAS § 23.27 (1989). And we do not define that interest here as that question has not been certified to us or briefed by the parties. We also see the wisdom in not adopting "an early arbitrary classification" and instead allowing the "various incidents and . . . full characteristics [of an oil and gas lease to be] revealed by litigation as specific problems arise." *Id.* § 23.2. We therefore save all of these issues for another day when they are properly before us.

[11] We caution that, in addition to general and consequential damages, the measure of expectation damages also includes other losses caused by the breach (e.g., incidental losses). We further caution that the remedy for breach of a contract in general and, by extension, for breach of a lease, is not limited to expectation damages. Other potential remedies may include substitution performance costs and reliance damages. DOBBS, LAW OF REMEDIES §§ 3.3(5), 12.2(2), & 12.3(1) (2d ed. 1993). Nothing in this opinion should be interpreted as narrowing the broad formulation of general damages or the applicability of such other remedies.

116 P.3d 342 (citation omitted).[12] The overarching goal of expectation damages and, hence, of general and consequential damages, is to compensate the nonbreaching party "for actual injury sustained, so that [the nonbreaching party] may be restored, as nearly as possible, to the position [it] was in prior to the injury." *Mahmood v. Ross*, 1999 UT 104, ¶ 19, 990 P.2d 933 (citation omitted). "The difference between the two types of damages is of importance because," among other reasons, "[consequential] damages must ordinarily be pleaded in order to be recovered." *Cohn v. J.C. Penney Co.*, 537 P.2d 306, 307 (Utah 1975).

¶ 16 General damages for a breach of contract or lease are measured by "the market value of the very thing promised, at the time of performance." DOBBS, LAW OF REMEDIES § 12.1(1). Such general damages "are said to be implied in law" because they are "the probable and necessary result of[] the injury." *Cohn*, 537 P.2d at 307–08. Hence, "[t]hey are damages which everybody knows are likely to result from the harm described." *Id.* at 307. Thus, the general rule is that "the measure of damages for breach of an executory contract to purchase real property or an interest therein[] is the difference between the contract price and the market value of the land at the time of the breach." *Justheim Petroleum Co. v. Hammond*, 227 F.2d 629, 637 n.9, (10th Cir. 1955) (citing, among other cases, *Dopp v. Richards*, 135 P. 98 (Utah 1913)). For the purposes of the narrow question certified to us, we are treating an oil and gas lease as akin to a contract for an interest in property. Therefore, the same general rule should apply, meaning that we measure general damages for the breach of the oil and gas lease as the difference between the contract price of the lease and the market value of the lease at the time of the breach. *But see supra* ¶ 8 n.2.

¶ 17 Consequential damages, in contrast, "are measured . . . by the gains [the promised] performance could produce . . . or the

---

[12] When writing about expectation damages, courts and commentators often refer to general damages as direct damages and consequential damages as special damages. *See, e.g.*, *McCleve Props., LLC v. D. Ray Hult Family Ltd. P'ship*, 2013 UT App 185, ¶ 17, 307 P.3d 650; DOBBS, LAW OF REMEDIES § 12.2(3). The distinction is one of phraseology, not substance.

loss that is produced by the absence of such performance." DOBBS, LAW OF REMEDIES § 12.1(1). They "are the natural, but not the necessary, result of an injury . . . and thus are not implied by law." *Cohn*, 537 P.2d at 308. Therefore, consequential damages "mean[] particular items of damages which result from circumstances peculiar to the case at hand." *Prince v. Peterson*, 538 P.2d 1325, 1328 (Utah 1975). To recover consequential damages, an injured "party must prove (1) that consequential damages were caused by the contract breach; (2) that consequential damages ought to be allowed because they were foreseeable at the time the parties contracted; and (3) the amount of consequential damages within a reasonable certainty." *Mahmood*, 1999 UT 104, ¶ 20.

¶ 18 Both general and consequential damages may be recovered in an appropriate case:

> We again reiterate that, in addition to general damages, one is entitled to recover those [consequential] damages which arise from circumstances peculiar to a particular case, provided they may be reasonably supposed to have been within the contemplation of the parties when the contract was made, and provided further, that they are properly pleaded and proved.

*Ranch Homes, Inc. v. Greater Park City Corp.*, 592 P.2d 620, 624 (Utah 1979) (footnote omitted); *see also Mahmood*, 1999 UT 104, ¶ 19.

¶ 19 When we apply the rule for general damages, as described above, it is clear that Trans-Western is entitled to general damages, as measured by the difference between the contract price of its oil and gas lease and the market value of that lease at the time of U.S. Gypsum's breach. As to Trans-Western's claim that it is entitled to the value of the lost profit from a hypothetical sale of its lease to a third party sometime during the lease term of five years, that claim is a claim for lost profits and, because it results from "collateral business arrangements" peculiar to the case, is a claim for consequential damages. DOBBS, LAW OF REMEDIES § 3.3(4); *see also In re Indesco Int'l, Inc.*, 451 B.R. 274, 313–14 (Bankr. S.D.N.Y. 2011).[13] Trans-Western may be

---

[13] "One common form of consequential damages is . . . lost profits." DOBBS, LAW OF REMEDIES § 3.3(4). And while "[l]awyers often speak loosely about 'profits,' . . . not all lost gains are lost

(cont.)

entitled to such consequential damages[14] if it can (1) establish that those damages were caused by U.S. Gypsum's breach, (2) establish that those damages were foreseeable at the time the parties entered into the lease, and (3) establish those damages with reasonable certainty. *See Mahmood*, 1999 UT 104, ¶ 20.[15]

---

profits and not all lost gains are measured by consequential damages." *Id.* Consider the following hypothetical: "the plaintiff contracts to purchase Blackacre for $10,000 and at the time of performance its market value is $20,000, then the plaintiff surely has an expectancy; but since that expectancy reflects a market gain in the very performance contracted for, it is an item of general damages," not consequential damages. *Id.* § 12.2(3). Alternatively, suppose a plaintiff owns a movie theater and leases property next to the theater from a landlord for parking, and the landlord then denies plaintiff access to the parking lot, thereby breaching the lease. Without convenient parking, film enthusiasts take their business elsewhere. The plaintiff sues for the movie theater's lost profits, which are consequential damages.

[14] We are cognizant that Trans-Western claims that the issue of consequential damages is not before us. However, given that the question certified to us centers entirely on how expectation damages are to be measured, and given that consequential damages are an essential feature of expectation damages, we do not see how we could answer the question without addressing consequential damages. We are also cognizant that the federal district court appears to have already decided the consequential damages issue.

[15] We note our agreement here with the statement of the court in *Anchor Savings Bank, FSB, v. United States*, 597 F.3d 1356, 1369 (Fed. Cir. 2010), that lost profit damages "that absent the breach, would have accrued on an ongoing basis over the course of the contract," may be "measured throughout the course of the contract." *Id.* (internal quotation marks omitted); *see also supra* ¶ 8 n.2.

We further note that there is good authority from outside of Utah that explicitly stands for the proposition that, "while consequential damages may be recovered only where the amount of loss is also capable of proof with reasonable certainty[,] with respect to general damages, however, the amount need not be

(cont.)

¶ 20  In sum, since the general rules for measuring expectation damages apply to claims for expectation damages for the breach of an oil and gas lease, the appropriate measure of general damages for such a breach is the difference between the contract price of the lease and the market value of the lease, which, depending on the circumstances, may be at the time that the lease was breached or throughout the lease (e.g., in the case of a continuing breach). Additionally, consequential damages are also available provided they have been appropriately pleaded and proved.

---

reasonably certain." *In re Indesco Int'l, Inc.*, 451 B.R. 274, 317 (Bankr. S.D.N.Y. 2011) (internal quotation marks omitted). Moreover, "[t]he non-breaching party need only provide a stable foundation for a reasonable estimate of the damage incurred before an award of general damages can be made." *Id.* (internal quotation marks omitted). The principal reason appears to be the aphorism of visiting "the burden of uncertainty . . . upon the wrongdoer." *Id.* And while there is no equivalent, overt statement in Utah law of which we are aware, our courts appear, on some occasions, to have adopted the same proposition:

> The proof of amount of damages is a less exacting standard [than the proof that damages exist] because [i]t is, after all, the wrongdoer, rather than the injured party, who should bear the burden of some uncertainty in the amount of damages. Thus, [t]he amount of damages may be based upon approximations, if the fact of damage is established, and the approximations are based upon reasonable assumptions or projections. Nonetheless, there still must be evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages.

*Ron Case Roofing & Asphalt Paving, L.L.C. v. Sturzenegger*, 2007 UT App 100, ¶ 14, 158 P.3d 556 (second and third alterations in original) (internal quotation marks and citations omitted). Because this issue has not been briefed in the case at bar, we decline to openly adopt or reject the *In re Indesco International, Inc.* proposition at this time.

## II. THE TRIAL COURT HAS DISCRETION TO PERMIT THE USE OF POST-BREACH EVIDENCE TO ESTABLISH AND MEASURE EXPECTATION DAMAGES

¶ 21 Having determined how to establish expectation damages for the breach of an oil and gas lease, we now turn to the question of whether parties may use post-breach evidence to prove such damages.[16] We hold that a trial court has discretion to allow parties to use post-breach evidence to establish and measure their expectation damages.[17]

¶ 22 "[W]here it is necessary to fashion an appropriate award, a court may consider post-breach evidence when determining damages in order to place the non-breaching party in as good a position as [it] would have been had the contract been performed." *Anchor Sav. Bank, FSB, v. United States*, 597 F.3d 1356, 1369–70 (Fed. Cir. 2010) (internal quotation marks omitted). Several courts have considered post-breach evidence in the context of awarding expectancy damages when determining a lost profits award. *See, e.g.*, *Peck Iron & Metal Co. v. United States*, 603 F.2d 171, 175 (U.S. Ct. Cl. 1979) (use of post-breach evidence to determine a general damages claim); *Anchor*, 597 F.3d at 1370 (use of post-breach evidence to determine a consequential lost profits claim). While we acknowledge the existence of authorities to the contrary, we agree with those cited above and think courts should likewise be able to consider post-breach evidence in establishing and measuring expectation damages for the breach of an oil and gas lease, if they determine it appropriate to do so in the context

---

[16] In our order accepting the certified question, we requested that the parties address the question "in the particular context of the issues pending on appeal before the Tenth Circuit." Having had the benefit of the parties' briefing and arguments, we agree with Trans-Western that the certified question fairly implicates the "evidence plaintiffs will be called upon to use in establishing their damages" and, therefore, proceed to provide some guidance on the issue.

[17] While Trans-Western has phrased this issue in terms of its use of the best "evidence . . . available at trial," it appears to us that what is really in dispute is the use of post-breach evidence to establish expectation damages. We focus our analysis accordingly.

of a particular case. This approach is most consistent with our aim of affording district courts wide latitude in fashioning suitable damage awards. *See, e.g.*, *Clayton v. Crossroads Equip. Co.*, 655 P.2d 1125, 1130 (Utah 1982).

¶ 23　Thus, when claiming general damages, parties may be able to use post-breach evidence to help establish the value of a lease at the time of breach. For example, if a landlord breaches a lease by denying the plaintiff possession and then turns around and re-leases the property a few days later, this subsequent lease would be considered post-breach evidence and would likely also be credible evidence of the value of the plaintiff's lease at the time of the breach. There is no persuasive reason why we should prohibit parties from introducing such evidence to establish their general damages simply because that evidence is post-breach. The same holds true with respect to consequential damages. Indeed, we can readily envision cases in which a plaintiff can and should be able to establish and measure consequential damages that take the form of lost profits with post-breach evidence.[18]

## CONCLUSION

¶ 24　Although we have never before dealt with the specific question of how expectation damages are to be measured for the breach of an oil and gas lease, the answer is a familiar one because under Utah law we generally treat leases like other contracts. And we see no reason to vary from that practice here. Therefore, expectation damages for the breach of an oil and gas lease, just like expectation damages for a breach of contract, may consist of general and consequential damages. General damages are to be measured as the difference between the contract price of the lease and the market value of the lease at the time of the breach. Consequential damages are unique to a particular case, and

---

[18] This is not, however, an open invitation for courts to admit post-breach evidence without first subjecting it to appropriate scrutiny. Post-breach evidence, like any other evidence, must meet the evidentiary standards for admissibility (e.g., the evidence must be relevant and may not be speculative). *See Cook Assocs., Inc. v. Utah Sch. and Institutional Tr. Lands Admin.*, 2010 UT App 284, ¶ 36, 243 P.3d 888. We expect that trial courts, in their discretion, will properly apply the tools in their evidentiary tool kits to guard against improper awards.

parties must establish that they were caused by the breach, establish that they were foreseeable, and establish the amount of damages with reasonable certainty. Finally, in the discretion of the trial court, parties may introduce post-breach evidence to establish and measure their expectation damages.