**Megan Han LEE, By her Mother and Next Friend, Deborah Lynn LEE and Deborah Lynn Lee, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 97–5015.

United States Court of Appeals, Federal Circuit.

Sept. 17, 1997.

---

**5.** The record does not indicate why the agency was hiring while in contemplation of and during a RIF.

counsel on the brief was Major Dru Brenner–Beck and Major Leo E. Boucher, Tort Branch, Army Litigation Division, Legal Services Division, Department of the Army, Arlington, VA.

Before CLEVENGER, SCHALL, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

In April 1989, Megan Han Lee, a two-year-old child, was being cared for in the home of United States Army Sgt. Boyce Garner and his wife as part of an Army child-care program. One day while Ms. Garner left the home to go shopping, Sgt. Garner placed Megan in a bathtub filled with hot water. When Megan attempted to get out of the bathtub, Sgt. Garner struck her and held her in the water. Megan sustained serious burns as a result.

Sgt. Garner was convicted of criminal child abuse in connection with the incident. Megan and her mother, Deborah Lynn Lee, first sued the Garners in the United States District Court for the District of Maryland, where they obtained a default judgment. The Lees then brought suit against the United States in the Court of Federal Claims seeking damages for breach of an insurance contract relating to the rendering of child care services. The Court of Federal Claims granted summary judgment in favor of the government. We agree with the Court of Federal Claims that the United States did not breach a contract that would entitle the Lees to recover against the United States for their injuries, and we therefore affirm.

Robert A. Mazzoni, Scranton, PA, argued for plaintiffs-appellants. With him on brief was Peter Ayers Wimbrow, III, Ocean City, MD.

Harold D. Lester, Jr., Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Of

I

At the time of the incident giving rise to this case, Deborah Lee was enlisted in the United States Army and was stationed at the Aberdeen Proving Grounds in Maryland where she was receiving training in vehicle mechanics. To accommodate her training schedule, she enrolled her daughter in the Family Child Care ("FCC") program offered to base personnel. Through the program, Deborah Lee selected Marilyn Garner, the

wife of Sgt. Garner, as her daughter's child care provider.

As part of the FCC certification process, Marilyn Garner submitted an application to Aberdeen's Child Development Services, which obtained a background clearance for both Sgt. and Marilyn Garner. Ms. Garner executed a document entitled "Statement of Understanding Regarding Home–Based Child Care Insurance Coverage Under The U.S. Army Nonappropriated Fund Risk Management Program." The Statement of Understanding provided, in pertinent part:

> D. I understand ... that as a certified FCC provider I am automatically insured under the U.S. Army Nonappropriated Fund Risk Management Program (RIMP).... Although FCC providers are not nonappropriated fund employees, insurance coverage is provided and paid for by the Army to cover FCC providers for their own protection.
>
> E. I understand that I am insured under RIMP for up to $500,000 for any individual claim arising out of the death or injury of any child under my care which occurs as a result of a negligent act or omission on my part, or on the part of any member of my household.
>
> F. I understand that I am not insured for any injury or death to children under my care arising out of any criminal act or omission, or, as a result of any otherwise intentional tort or intentional violation of applicable laws or regulations (e.g. assault, battery, indecent assault, rape, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit) on my part or the part of a member of my household.... I understand that legal representation, if it is provided, will be provided solely to protect the interests of the insurance fund. I understand that I may retain private counsel at my own expense anytime I feel it advisable in order to protect my own interest (e.g., when my actions may be outside the scope of RIMP coverage, when my own interests are in conflict with those interests being represented by the U.S. Attorney or by private counsel retained to represent the interest of the insurance fund.)

After Ms. Garner was certified to serve as an FCC provider, she began to provide care for Megan Lee at her home under the program. On April 12, 1989, approximately one month after Ms. Garner began to care for Megan, Ms. Garner left her home to go to the grocery store. She left Megan and her own daughter in the care of Sgt. Garner, who was not a certified FCC provider. Sgt. Garner told his wife that he would bathe Megan and their daughter while Ms. Garner went to the store. During Ms. Garner's absence, Sgt. Garner engaged in the conduct that led to Megan's injuries.

On April 9, 1990, Megan and her mother filed a complaint in the United States District Court for the District of Maryland seeking damages from the Garners for injuries arising out of the bathtub incident. The Lees did not bring a claim against the United States at that time. Through counsel, the Garners informed the United States Army of the district court action and asserted that the RIMP was responsible for providing insurance coverage and defending the Garners in that action. The Army's representatives denied the Garners' requests for coverage and representation, contending that "the Army is not liable for injuries which resulted from criminal conduct."

The Garners failed to defend the district court action, and the court accordingly entered a default judgment on the Lees' complaint. The Lees were awarded a judgment against the Garners for more than $700,000. The Garners subsequently assigned to the Lees their rights against the government under the insurance agreement.

The Lees then filed a complaint against the United States in the Court of Federal Claims seeking to recover damages from the RIMP. The government first responded that the court lacked jurisdiction to entertain the complaint because the RIMP was a nonappropriated fund instrumentality ("NAFI") and that the United States has not waived its sovereign immunity with respect to claims that arise under contracts with NAFIs such as the RIMP. The court held that the United States was not immune from suit on that ground and therefore denied the govern-

ment's motion to dismiss the complaint for lack of jurisdiction.

The parties then filed cross-motions for summary judgment. At the outset, the court concluded that a contractual relationship existed between Ms. Garner and the United States. The court found that the government had undertaken "to insure the FCC child care provider, and in return the provider agreed to comply with the FCC certification process." The court also held that the Lees were third party beneficiaries of the contract and thus were entitled to enforce the terms of the agreement.

On the merits, the court held that the Statement of Understanding and the RIMP regulations excluded coverage for claims arising out of criminal acts, such as Sgt. Garner's treatment of Megan. With respect to the claim that Ms. Garner was negligent for leaving Megan in Sgt. Garner's care, the court held that Sgt. Garner's criminal act was "an intervening event" that caused the injury, "thereby superseding [any] original negligence." The court further held that, even if Sgt. Garner's criminal act was a "concurrent" rather than "superseding cause" of Megan's injuries, the plain language of the Statement of Understanding and the RIMP regulations excluded coverage because the injuries arose, at least in part, from a criminal act. The court therefore granted the government's motion for summary judgment. This appeal followed.

## II

■ We first address the government's argument that the Court of Federal Claims lacks jurisdiction over the Lees' claim, because the complaint is based on a contract with a NAFI as to which there has been no waiver of sovereign immunity. The Court of Federal Claims rejected the government's jurisdictional challenge, and so do we.

■ The Tucker Act, 28 U.S.C. § 1491, generally limits the jurisdiction of the Court of Federal Claims to cases in which the court's judgments could be paid from appropriated funds. *United States v. General Elec. Corp.*, 727 F.2d 1567, 1570 (Fed.Cir.1984). With a few specific exceptions, *see* 28 U.S.C.

§ 1491(a)(1), disputes arising from contracts entered into by a federal instrumentality fall outside the jurisdiction of the Court of Federal Claims if "Congress intended that the activity resulting in the claim was not to receive or be funded from appropriated funds." *L'Enfant Plaza Properties, Inc. v. United States*, 229 Ct.Cl. 278, 668 F.2d 1211, 1212 (1982).

The RIMP provides a form of insurance coverage to protect the assets of NAFIs against administrative claims arising out of NAFI activities. As of 1985, the Army implemented a plan to add liability coverage under the RIMP for quarters-based FCC providers, such as Ms. Garner. The Army Central Insurance Fund ("ACIF") is itself a NAFI that receives and disburses funds of the RIMP. Specifically, the ACIF maintains a RIMP claim fund for FCC program providers, which is used to pay claims against FCC providers adjudicated in accordance with Army regulations. *See* Army Reg. 215–1, ch. 13, § 5.

On November 29, 1989, as part of the National Defense Authorization Act for Fiscal Years 1990 and 1991, Pub.L. No. 101–189, Congress enacted the Military Child Care Act of 1989, 103 Stat. 1352, 1590. That Act authorized the Department of Defense to use appropriated funds "for operating expenses for military child care development centers," "for child care and child-related services of the Department," and "to provide assistance to family home day care providers so that family home day care services can be provided to members of the Armed Forces at a cost comparable to the cost of services provided by military child development centers." 103 Stat. at 1590, 1595. The Department of Defense has interpreted that Act and subsequent legislation providing funding for military child care programs to allow the use of appropriated funds to pay child-care provider RIMP fees in the FCC program, which in turn are used to pay FCC claims. Accordingly, payments made to satisfy FCC claims may now derive, at least in part, from appropriated funds.

The government acknowledges that if an agency is authorized to use both appropriated and nonappropriated funds to support its

activities, the NAFI doctrine precluding Court of Federal Claims jurisdiction does not apply. The government argues, however, that the RIMP was not authorized to spend appropriated funds until the enactment of the Military Child Care Act in late 1989, and that appropriated funds could not be used to pay the claim in this case, which arose out of conduct that occurred in April 1989. Specifically, the government asserts that in view of the "bona fide needs" rule, *see* 31 U.S.C. § 1502, any liability arising from an FCC insurance agreement may not be discharged with funds appropriated in a fiscal year other than the fiscal year in which the agreement was entered into and performed.

■ The "bona fide needs" rule stands for the proposition that appropriations for a particular year are to be obligated by an agency only to meet legitimate needs arising in the year of appropriation. *See* United States General Accounting Office, Office of General Counsel, *Principles of Federal Appropriations Law,* OGC–91–5, Vol. I, at 5–9 to 5–13 (1991). The rule is intended to "prevent agencies which do not have funds on hand for a particular purpose from committing the Government to make payments at some future time and thereby, in effect, coercing the Congress into making an appropriation to cover the commitment." 63 Comp. Gen. 129, 130–31 (1983). That rule, however, has no place in the context of judgments entered by the Court of Federal Claims.

Once a claim for contract damages takes the form of a final judgment in the Court of Federal Claims, the judgment is paid by the United States, normally from the permanent, indefinite congressional appropriation known as the "judgment fund." *See* 31 U.S.C. § 1304; *see also Lopez v. A.C. & S, Inc.,* 858 F.2d 712, 716 (Fed.Cir.1988); 63 Comp. Gen. 470, 472–73 (1984). Under section 612(c) of the Contract Disputes Act, "the agency whose appropriations were used for the contract" must reimburse the judgment fund either out of available funds or by obtaining additional appropriations to cover the reimbursement expense. 41 U.S.C. § 612(c).

The reimbursement of the permanent judgment appropriation required by section 612(c) must be made "from funds otherwise available for ongoing programs, i.e., current funds." 63 Comp. Gen. 308, 311 (1984). As explained in the Senate Committee report on the Contract Disputes Act, the purpose behind that requirement is to induce agencies to resolve disputes:

> Requiring the agencies to shoulder the responsibility for interest and payment of judgments brings to bear on them the only real incentives available to induce more management involvement in contract administration and dispute resolution. Either the Agencies must use some part of their program funds to pay the interest and the judgment, or they must seek additional funds from Congress for this purpose. The former course can have an impact on current programs; the latter would necessitate an explanation to a congressional committee.

S. Rep. No. 95–1118, at 33 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5267.

The reimbursement provision therefore shifts the source of payment from the general appropriation of the judgment fund to the agency's current appropriations. Accordingly, as of the enactment of the Military Child Care Act of 1989, any judgment against the United States on a contract claim arising out of the FCC could ultimately be paid from current appropriated funds of the Department of Defense. For that reason, the Court of Federal Claims has jurisdiction over the claim in this case. *See Convery v. United States,* 220 Ct.Cl. 106, 597 F.2d 727, 730 (Ct.Cl.1979).

### III

■ We next turn to the Lees' argument that the United States is collaterally estopped by the judgment of the United States District Court for the District of Maryland from arguing that Ms. Garner's negligence was not the cause of Megan Lee's injuries. We reject the Lees' argument for two reasons.

■ First, collateral estoppel may be employed to preclude the relitigation of issues only when those issues were "actually litigated" in a prior law suit. *See Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d

1566, 1569 (Fed.Cir.1983). In this case, the Lees are attempting to estop the government on the basis of a default judgment. When judgment is issued as the result of a default, however, the underlying issues have not been actually litigated. For that reason, a default judgment cannot serve to preclude the litigation of issues under the doctrine of collateral estoppel. *See Schendel v. Curtis,* 83 F.3d 1399, 1405 (Fed.Cir.1996); *Restatement (Second) of Judgments* § 27 cmt. e (1982); 18 James Wm. Moore, *Moore's Federal Practice,* § 132.03[2][k] (3d ed.1997). Accordingly, the district court action cannot be used to estop the government from litigating the issue of negligence in this case.

■ Second, the Lees' collateral estoppel argument fails because the government was neither a party nor in privity with a party to the district court action, which is a prerequisite for invoking collateral estoppel. *See Commissioner v. Sunnen,* 333 U.S. 591, 597–98, 68 S.Ct. 715, 719–20, 92 L.Ed. 898 (1948). Although it is undisputed that the United States was not a party to the prior district court action, in which only the Garners were named as defendants, the Lees argue that the United States was in privity with the Garners in that case. In support of their claim of privity, the Lees assert (1) that under the insurance arrangement the government had a duty to defend Ms. Garner in any liability actions arguably falling within the scope of the insurance coverage, and (2) that the duty to defend rendered the government in privity with Ms. Garner for collateral estoppel purposes.

The Lees cite various cases holding that an insurer's duty to defend an insured under an insurance policy is determined with reference to the allegations of the complaint and that the duty to defend is triggered when there is a "potentiality" of coverage under the policy. *See, e.g., Farmers Ins. Co. v. Vagnozzi,* 138 Ariz. 443, 675 P.2d 703, 706 (1983); *St. Paul Fire & Marine Ins. Co. v. Pryseski,* 292 Md. 187, 438 A.2d 282, 285 (1981); *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 347 A.2d 842, 850 (1975). In those cases, however, the insurance policy specifically included a promise by the insurer to defend the insured. The duty to defend an insured is

contractual, and if the contract disclaims any duty to defend, it is improper for the courts to create one. *See* 7C John Alan Appleman, *Insurance Law and Practice* § 4682 (Buckley ed. 1979 & Supp.1997); 1 A. Windt, *Insurance Claims & Disputes: Representation of Insurance Companies & Insureds* § 4.01, at 146 n. 1 (3d ed.1995); Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 9.1(b) (1988).

The Statement of Understanding in this case specifically addresses the issue of legal representation and makes clear that the government has no duty to defend the insured. It states that "legal representation, if it is provided, will be provided solely to protect the interests of the insurance fund" and that the insured may obtain private counsel at his or her own expense when "advisable in order to protect" the interest of the insured.

The Army regulations that govern the RIMP also support the conclusion that the government had no duty to defend the Garners in the Maryland district court action. The regulations permit NAFI funds to be used to pay legal expenses when an FCC provider is sued, but that step is taken only if the Judge Advocate General of the Army determines that the claim is within the coverage of the insurance arrangement, *i.e.,* based on a negligent act or omission, rather than a criminal act or intentional tort. Army Reg. 215–1, ch. 3, §§ 11(b)(2) & (c). The regulations further state that any counsel employed by the Army in litigation relating to child care would represent the interest of the insurance fund rather than the FCC provider. *Id.* § 11(c)(7). Like the Statement of Understanding, the regulations also state that "FCC providers are authorized to retain private counsel at their own expense any time they feel it advisable to do so in order to protect their own interests." *Id.*

The facts asserted in the Lees' complaint potentially give rise to liability under the insurance agreement. The duty to provide liability coverage, however, is based on the language of the agreement between the government and the Garners; there is no like duty to defend created by that agreement. Contrary to the Lees' theory, therefore, the government was not in privity with the Gar-

ners in the Maryland district court action and cannot be estopped by the judgment rendered in that case. *See Beacon Oil Co. v. O'Leary,* 71 F.3d 391, 395 (Fed.Cir.1995).

## IV

■ We now reach the Lees' principal ground for establishing liability. They argue that Ms. Garner was insured against liability resulting from her own negligence and that the Lees, as third party beneficiaries of the insurance agreement, are entitled to recover from the RIMP for injuries falling within the coverage of the agreement. The Lees' argument, however, is precluded by the language of the Statement of Understanding and the regulations governing the RIMP program. Because we find that the Lees have no right of recovery against the United States on the merits of their claim, we do not address the government's argument that the Court of Federal Claims was in error in concluding that the Lees were third party beneficiaries of the insurance agreement.

The Statement of Understanding provides that insurance coverage extends to any claim arising out of injury or death "which occurs as a result of a negligent act or omission" on the part of the insured. Yet it excludes coverage for injury or death "arising out of any criminal act or omission, or as a result of any otherwise intentional tort ... on [the provider's] part or the part of a member of [the provider's] household." The Army regulations similarly limit the scope of coverage. The regulations provide: "The claim or action must be based on a negligent act or omission. Excluded is any death or injury of a child arising out of a criminal act or omission or any otherwise intentional tort ... by the provider or a member of the household." Army Reg. 215–1, ch. 3, § 11(c)(2).

There is no dispute as to the direct cause of Megan Lee's injuries. Sgt. Garner intentionally struck Megan and submerged her in hot bath water, acts for which he was criminally prosecuted and convicted. The exclusion set forth in the insurance contract and Army regulations plainly covers injuries arising under such circumstances. The Lees, however, argue that the chain of causation for Megan's injuries can be traced to the negligence of Ms. Garner in leaving Megan alone with an uncertified care provider.

The Lees concede that in order for Ms. Garner's alleged negligence to have caused Megan's injuries within the meaning of the insurance agreement, the actions of Sgt. Garner must have been foreseeable at the time Ms. Garner left Megan in her husband's custody. They further concede that there is nothing in the record to suggest that Ms. Garner had any reason to anticipate that her husband might assault Megan as he did. They argue, however, that the element of foreseeability is provided by Ms. Garner's violation of the regulations governing family child care providers by leaving Megan at home with an unauthorized person while she went to the grocery store.

Contrary to the Lees' argument, Ms. Garner's regulatory violation goes to the issue of her negligence, not to the issue of causation. The question of causation does not turn on whether Ms. Garner should have left Megan with Sgt. Garner, but on whether she should have foreseen that her husband might commit a criminal act against Megan in her absence. *See Restatement (Second) of Torts* § 448 (1965); *Baltimore Gas & Elec. Co. v. Lane,* 338 Md. 34, 656 A.2d 307, 315 (1995). As the trial court observed, the record "does not indicate that Ms. Garner believed her husband would commit criminal battery upon Megan or that Mr. Garner's criminal act was a natural and ordinary consequence of her negligence." Because, as the court concluded, Sgt. Garner's criminal act "was a superseding cause which cut off the chain of causation," the injury to Megan must be regarded as arising from Sgt. Garner's criminal conduct, and not from Ms. Garner's negligence. Megan's injury was therefore not within the coverage of the insurance agreement between the government and Ms. Garner.

Each party shall bear its own costs for this appeal.

*AFFIRMED.*